[S.F. No. 22799. In Bank. Sept. 14, 1971.]

In re EDWARD R. PLOTNER on Disbarment.

**COUNSEL**

Wagener, Lynch, Curran & Minney and Samuel H. Wagener for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

**OPINION**

**THE COURT.**—Petitioner seeks review of a report and recommendation of the Disciplinary Board that he be disbarred.

In 1967, petitioner was convicted, on his guilty pleas, of violations of section 496 of the Penal Code (receiving stolen property) and section 274 of the Penal Code (supplying or administering an abortion). In 1968, this court, for his conviction of section 496, a crime involving moral turpitude, suspended him from practice until further order. After his convictions became final, this court referred the matter to the State Bar for a hearing, report, and recommendation as to the nature and extent of discipline

to be imposed for the violation of section 496 and as to whether the facts and circumstances surrounding the commission of the violation of section 274 involved moral turpitude and, if so found, for a recommendation as to the nature and extent of the aggregate discipline to be imposed. (See Bus. & Prof. Code, §§ 6101-6102.)

A Special Administrative Committee hearing was held on April 20, 1970, and on December 11, 1970, the Disciplinary Board held a hearing. The committee unanimously found, and the board found by a 10 to 1 vote, that petitioner's violation of section 274 of the Penal Code involved moral turpitude. Both the committee (by a vote of 2 to 1) and the board (by a vote of 9 to 2) recommended disbarment. Petitioner has a prior record of discipline (private reproval by the Board of Governors in 1953 and public reproval by Disciplinary Board I in 1967[1]); and, in recommending disbarment, the Disciplinary Board took into consideration such prior record.

Petitioner, who was admitted to practice in this state in 1943 and is an experienced practitioner, concedes the "inexcusable" nature of his offenses, but he urges that mitigation is warranted due to a claimed amphetamine addiction which allegedly affected his mind, colored his thinking, and underlay his actions. He further claims that he is presently rehabilitated and is now in a condition to engage in the practice of law on the conditions that he be of good moral character and abstain from the use of amphetamine drugs.

■ The burden is on petitioner to show that the Disciplinary Board's recommendation is erroneous or unlawful (see *Monroe* v. *State Bar,* 70 Cal.2d 301, 307 [2] [74 Cal.Rptr. 733, 450 P.2d 53]; *McKinney* v. *State Bar,* 62 Cal.2d 194, 195 [2] [41 Cal.Rptr. 665, 397 P.2d 425]). Upon an examination of the record, however, we have concluded that petitioner's crimes were not caused solely by an amphetamine addiction but were the result of his deliberate and knowing acts and that he has sought by various deliberate maneuvers, from the time he was arrested, to avoid the foreseeable consequences in both the criminal action and this disciplinary pro-

---

[1]In 1953, the Board of Governors privately reproved petitioner for his misleading a trial court in a divorce action concerning the wife's alleged use of community savings for her living expenses and her alleged inability to pay petitioner's fees when, in fact, petitioner was holding the community savings in his safe. In 1967 (one month before petitioner's arrest for the crimes giving rise to this proceeding), Disciplinary Board I publicly reproved him. In that proceeding, the board found, in substance, that in one transaction petitioner misappropriated funds he was holding as trustee under court order for payment to creditors and the parties, and that in a second transaction, involving a different client, petitioner erroneously used his client's settlement proceeds and repaid the client only after State Bar investigation.

ceeding, that is, imprisonment and disbarment. As a result, petitioner has not met the burden imposed upon him.

Petitioner was arrested July 18, 1967. On September 6, 1967, he pleaded guilty in the municipal court to both felony offenses. On September 22, 1967, he was referred by the superior court to the county probation department. The probation officer's report was filed November 27, 1967, and recommended that probation be denied. In the report it is stated, among other things: "An amoral personality, this defendant has consistently evidenced self-destructive tendencies, also affecting those with whom he has come in contact. He shows little guilt and perhaps simply does not perceive himself as deviant."

The day the probation officer's report was filed, criminal proceedings against petitioner were suspended to permit a 90-day observation of him at the California Medical Facility at Vacaville. He was received at Vacaville December 7, 1967; and, as a result of observations made of him there, the staff prepared a "cumulative case summary." As will hereinafter appear, it was recommended by the facility that petitioner be denied probation.

On the resumption of the criminal proceedings on March 14, 1968, petitioner sought for the first time to set aside his guilty pleas on the ground of alleged mental incapacity at the time of his offenses and at the time of his pleas of guilty. On March 29, 1968, the municipal court denied petitioner's motion; and on April 4, 1968, the superior court denied probation and sentenced petitioner to state prison. Petitioner was later delivered to the Department of Corrections at Vacaville. Thereafter, he sought unsuccessfully, by a timely notice of appeal, to urge his claims of mental incapacity in the Court of Appeal. On June 2, 1969, he was released from Vacaville and since July of that year has been employed in the law offices of Smith, Paduck & Clancy in Oakland as a law clerk.

The record shows that a client of petitioner's, while in the Contra Costa County jail in June 1967, asked petitioner to see another inmate in the jail, Mrs. Judy A. Epperson (about 20 years old) and to find a place for Mrs. Epperson to live when she was released. Petitioner agreed to help Mrs. Epperson, and some time after her release, she came to petitioner's office.

Mrs. Epperson told petitioner that she wanted to obtain an abortion; and petitioner referred her to a former client of his, John Simpson, who, according to petitioner, was "the type of person who can get it for you wholesale." At the committee hearing, petitioner was asked, in substance, if he had agreed to procure an abortion for Mrs. Epperson in return for her

sexual favors, and he replied: "No. It was not an understanding, but I had hopes, to be honest, but there was not—it didn't reach the point of a verbalization." He later testified that he had introduced Mrs. Epperson to Simpson without being promised anything, but with the hope that it would endear him to her and lead to a "close sexual relation with her."

On July 14, 1967, petitioner and his 17-year-old son met Mrs. Epperson and went to an apartment in Oakland. According to petitioner, the events of that day occurred substantially as described by Mrs. Epperson to the probation officer and as reported by the latter in his report to the superior court in the criminal case against petitioner. The probation officer's report reads, in part: "On Friday, July 14, 1967, [petitioner] arrived, saying he had some clothes for Epperson in Oakland. The clothes were reportedly stolen and she was to have her choice.

"They drove to an unknown apartment in Oakland where six Negro males were present. Everyone was drinking and it appears Epperson was offered a beer that was drugged. At this point, Epperson was asked if she could 'get rid' of some stolen bonds to be given her by the men in the apartment. Information also reveals that [petitioner] had conversation with the other men present regarding possible 'fencing' of the stolen bonds. This subject was dropped for the time being as the group continued drinking. Apparently, various types of stimulants were being used and [petitioner], and his son, were also taking stimulants. In time, Epperson states she was sexually 'assaulted' by the six Negro males present, in addition to [petitioner] and [petitioner's] 17 year old son. She says she was 'assaulted' more than once by each present."

Petitioner testified that when they went to the Oakland apartment, there was no intention to have a "lurid affair," but that it developed spontaneously; that they went there to contact some "shoplifters" to obtain some clothes for Mrs. Epperson; that he did not feel he should be driving and therefore had his son drive them to the apartment; that Mrs. Epperson was a willing participant in sexual activities which took place on the occasion; and that his son was "present" and "in and out" of the apartment during the events.[2]

At the committee hearing, petitioner testified that after the July 14th incident in Oakland he took a room with Mrs. Epperson at the Concord Inn; that they stayed for one or two nights; that while there both of them were "loaded on drugs," and Mrs. Epperson was "raising hell" because

---

[2]See, among crimes against children, Penal Code sections 272 (contributing to the delinquency of a minor), 273a (endangering health of minor), and 273g (immoral practices in presence of minor).

he was not doing anything to arrange for an abortion for her; and that he called Simpson, who told him that he (Simpson) had "made arrangements" and would be over with a doctor and that petitioner should "get out of there." Petitioner further said that he did not know of any details of fees to be paid Simpson and the "doctor" to perform the abortion; that he had his doubts whether the doctor "was a real doctor"; that he did not pay Simpson or the "doctor" any money for their services; and that he thought that it was a gratuity and that Mrs. Epperson's attractiveness had motivated Simpson, too, to help her. Petitioner testified that he left the Concord Inn a short time before Simpson arrived and that he never saw Mrs. Epperson again. Petitioner's son was with him at the Concord Inn.

Concerning petitioner's receipt of the stolen bonds (about $13,000 worth of United States Savings Bonds), the probation officer's report reads, in part: "On July 17, 1967, information was received by the United States Treasury Department that [petitioner], residing in Room 327, Concord Inn, had stolen United States Savings Bonds for sale. Arrangements were made for an undercover agent to contact [petitioner] concerning a proposed purchase of the bonds. An undercover agent to be named 'Bob Norton' was to meet with [petitioner] at the Concord Inn at 12:30 p.m., July 18, 1967, at which time the purchase of the bonds could probably be negotiated. As arranged, the undercover agent called for [petitioner] at the Concord Inn. . . .

". . . . . . . . . . . . . . . . . . .

". . . Some negotiation took place, and an amount of $4000 for the purchase price was agreed upon. . . .

"At the conclusion of their conversation, [petitioner] and the agent walked across the parking lot to an undercover car where the agent gave a prearranged signal that he had observed the bonds. With assistance from other agents, [petitioner] was placed under arrest and told to lean against an adjoining car for a search. At that moment, [petitioner] attempted to conceal the bonds by jamming them between the bumper and the rear of the car."

Petitioner testified that he had received the bonds from one of the men at the Oakland apartment; that he later contacted Simpson, who arranged the meeting at the Concord Inn, at which the bonds were, hopefully, to be sold; and that although nothing was said about compensation at the time he received the bonds, he was sure it was understood that he would "get something out of it."

Petitioner has been examined by a number of psychiatrists. Prior to

his arrest, he apparently on several occasions sought psychiatric help because of his alleged addiction to amphetamines, but he did not follow through in obtaining any sustained treatment. On August 12, 1967, which was about three and a half weeks after his arrest, petitioner, at the request of his counsel, was seen by William McGaughey, M.D., in Oakland. Petitioner's counsel subsequently stated that his purpose in sending petitioner to Dr. McGaughey was to lay the basis for a commitment to the California Rehabilitation Center.

Dr. McGaughey's report, dated November 13, 1967, indicates that he saw petitioner at irregular intervals after August 12, 1967, and that petitioner had told him that about three years previously (in about 1964) he began to use methedrine, that he and his wife would go on many "methedrine binges" and would "come down" again by taking barbiturates, and that in between binges he had taken amphetamines daily in order to carry on "some semblance of professional activity." Dr. McGaughey's report shows that during the first few interviews, petitioner was so confused that Dr. McGaughey thought he might be suffering from "permanent irreversible organic brain damage resulting from toxic insult to the brain by drugs," but that petitioner later showed a great improvement and appeared to have recovered from the intoxicating effects of the drugs. He stated that although petitioner's mental condition had been "clearing up," it was his opinion that petitioner was suffering from "Acute Brain Syndrome, Drug Intoxication, Methamphetamine" at the time of the alleged offenses. He also stated that if the court should consider probationary status for petitioner, he would recommend that it be continued over a period of several years in order to help petitioner become permanently stable and self-controlled.

While petitioner was at the California Medical Facility at Vacaville for his observation period, he was examined in December 1967 by R. G. Kuehnert, M.D., a consulting psychiatrist. Dr. Kuehnert's report, dated December 21, 1967, indicates that he had seldom encountered an accumulation of such illegal behavior on anyone's part, especially with respect to someone in petitioner's position. Harry G. Wortman, a correctional counselor at Vacaville, prepared a detailed evaluation of petitioner, in which he referred to petitioner's "good mental acumen" and "brains and experience" qualifying him for employment in a new field, and urged that petitioner be given probation. A staff psychologist at Vacaville, Carl W. Swedenburg, gave petitioner various tests. which showed no impairment in functioning but only emotional instability and sociopathic trends.

Petitioner was released from the 90-day observation referral at Vaca-

ville on February 5, 1968. On February 9, 1968, he again consulted Dr. McGaughey, who wrote a letter to the superior court, dated February 19, 1968, stating that the previously noted mental confusion, indicative of organic brain disease, had cleared up entirely; that petitioner had recovered from the effects of the prolonged use of methedrine and no longer required inpatient psychiatric care and treatment; and that petitioner had potentials for a constructive, worthwhile future.

Thereafter, petitioner consulted still another psychiatrist in private practice, Walter Rapaport, M.D. On March 5, 1968, Dr. Rapaport wrote a one-page report to one of petitioner's counsel, stating that his examination showed no present evidence of mental illness; that he was of the opinion that most, if not all, of petitioner's wrongful conduct was due to drug intoxication; and that under treatment at Vacaville petitioner apparently improved partially, regained his sense of decency, and developed motivation for re-establishing himself as a law-abiding citizen.

As hereinabove indicated, in the middle of March 1968 petitioner's counsel filed a motion to set aside petitioner's guilty pleas and enter pleas to both charges (receiving stolen property and abortion) of "not guilty by reason of insanity." Counsel alleged, in substance, that the motion was based on facts that petitioner's pleas were made by reason of "mistake, ignorance, inadvertence" and were entered at a time when petitioner lacked the exercise of a "free judgment" because of his prolonged use of and addiction to amphetamines and when petitioner's judgment was grossly impaired and he was unable to reflect meaningfully on his acts.

At the time petitioner's motion was heard, he filed his own declaration under penalty of perjury and a one-page letter from another psychiatrist, Joel Fort, M.D. In his declaration under penalty of perjury, petitioner alleged, in part: "Since the time of the alleged offenses (July of 1967), I have undergone substantial psychiatric evaluation and treatment, including approximately sixty (60) days in the California Medical Facility at Vacaville. As a result of that treatment, I feel that I am now of reasonable mental capacity and able, *for the first time,* to understand the seriousness of the charges pending against me, and to recognize my mental condition at the time of the alleged crimes, and at the time of my pleas of guilty thereto.

". . . . . . . . . . . . . . . . .

"My condition totally prevented me from a free and voluntary exercise

of mature judgment at the time I was called upon to plead, and only because of this were pleas of guilty entered.[3]

---

[3]Originally, petitioner had entered pleas of not guilty but later changed his pleas to guilty. At the time he entered the latter pleas, the following proceedings occurred: "MR. NYE [Petitioner's counsel]: . . . Mr. Plotner [petitioner], it is your desire to ask the court to permit you to withdraw your pleas of not guilty for the purpose of entering a different plea to each charge? DEFENDANT PLOTNER: Yes. THE COURT: That's your desire, sir? You have thoroughly discussed this matter with both of your counsel; is that correct? DEFENDANT PLOTNER: Correct. THE COURT: Do you understand the nature of the charges filed against you? DEFENDANT PLOTNER: I do. THE COURT: Do you understand the ramifications of your change of plea? DEFENDANT PLOTNER: Yes. THE COURT: You have been a practicing lawyer for 25 years; you understand fully the effect of entering a plea at this time? DEFENDANT PLOTNER: This is my considered judgment. THE COURT: What is your plea to a charge of violation of Section 274, Abortion? DEFENDANT PLOTNER: Guilty. THE COURT: What is your plea to violation of 496 of the California Penal Code, receiving stolen property? DEFENDANT PLOTNER: Also plead guilty. THE COURT: These pleas are made on your part; is that correct? DEFENDANT PLOTNER: Yes. THE COURT: No threats have been made to you; no offers of inducement of any kind? DEFENDANT PLOTNER: None. THE COURT: You understand, you are fully aware of the fact that upon entering a plea of this nature you will be immediately referred to the Probation Department and the matter will be transferred to Superior Court for imposition of sentence; you understand that fully? DEFENDANT PLOTNER: Yes, your Honor. THE COURT: Once again, it seems rather redundant, but you understand in making this plea you are waiving your right to a preliminary hearing? DEFENDANT PLOTNER: Yes, your Honor. THE COURT: You are entering these pleas because in fact you are guilty, you did violate these sections of the Penal Code; is that correct? DEFENDANT PLOTNER: I feel that I am guilty and I so plead. THE COURT: You understand that both of these sections can very well result in imprisonment in the State Prison? DEFENDANT PLOTNER: Yes, I do. THE COURT: And you have had thorough, lengthy discussions with both counsel concerning your entry of a plea at this time? DEFENDANT PLOTNER: Yes, your Honor, I have. THE COURT: Are there any questions you gentlemen desire to ask on voir dire? MR. SPERBECK [Petitioner's co-counsel]: I have none. MR. NYE: We have known each other for approximately a quarter of a century? DEFENDANT PLOTNER: Yes. MR. NYE: We have tried cases together and against each other. Do you feel that you have had a full opportunity to consider your situation as to how to handle this matter? DEFENDANT PLOTNER: I do. We have discussed it together and Mr. Sperbeck several times and left it entirely up to me to make the final decision and this is my final decision. I feel I have done wrong, I am guilty and this is the only honorable thing to do and to subject myself to the process of the Court from here on out. MR. NYE: Thank you very much. That's all. MR. GINDER [deputy district attorney]: I would like to ask a few questions. It is my understand [sic] during the course of 25 years of practice, you have had numerous occasions to represent criminal defendants in criminal cases? DEFENDANT PLOTNER: Yes, sir. MR. GINDER: And therefore you understand how criminal procedure works perhaps better than most attorneys? DEFENDANT PLOTNER: Yes, I do. MR. GINDER: You have apparently had an opportunity to look through the entire file of the District Attorney's office in the matter; is that right? DEFENDANT PLOTNER: I don't know whether I have seen the entire file. I saw the file submitted to Mr. Nye and myself, yes. MR. GINDER: While you saw that, you had occasion to confer about its contents with both of your attorneys; is that right? DEFENDANT PLOTNER: Yes, I did. MR. GINDER: Since that time you have had an opportunity to think about this at great length? DEFENDANT PLOTNER: At great length. MR. GINDER: *In so far as your condition this morning is concerned, I take it that you are [of] sound mind, you are not under influence of*

"I have since been informed by counsel whom I believe to be competent that I have a good and meritorious defense to the charges against me. *In spite of my own prior professional experience, the very real possibility of such defense did not occur to me in my then confused mental state.*" (Italics added.)

Dr. Fort's letter, dated March 27, 1968 (two days before the hearing on petitioner's motion to set aside his guilty pleas), indicates that he had examined petitioner once (on an unspecified date) and had reviewed other reports on petitioner, including Dr. McGaughey's report. The letter reveals that the explanation which petitioner gave Dr. Fort regarding his drug use varied from explanations he gave Dr. McGaughey, the probation officer, and personnel at Vacaville. According to Dr. Fort, petitioner explained that his amphetamine use began in 1958 (rather than in 1960 or 1964) at the suggestion of a client, who indicated that it would improve sexual relations, and that often he would use barbiturates after prolonged amphetamine use. Dr. Fort concluded from the reports and the interview: "Before and during the time of his arrests in July 1967 and his guilty pleas in September 1967, [petitioner] had diminished capacity to form an intent and impaired judgment as a result of serious amphetamine abuse including an acute brain syndrome (temporary impairment of brain functioning). He is in need of extensive medical and psychiatric help."

On March 29, 1968, after considering the entire file, including petitioner's motion, his declaration under penalty of perjury, Dr. Fort's report, and the reports of Dr. McGaughey and Dr. Rapaport, the municipal court

---

anything; is that right? DEFENDANT PLOTNER: *To the best of my knowledge, I am of sound mind; I am not under influence of anything.* MR. GINDER: So for the first count of the complaint, that is abortion, it is my understanding that you are pleading guilty to that count because you are guilty? DEFENDANT PLOTNER: I believe in fact I am although my activity in regard [to the abortion] was a periphery to the action. I feel that I am guilty as a matter of fact, yes. MR. GINDER: You recognize you are guilty as being an accomplice to an abortion; is that right? DEFENDANT PLOTNER: Yes. MR. GINDER: So far as the second count is concerned, that is receiving stolen property, it is my understanding that you are pleading guilty because you are in fact guilty? DEFENDANT PLOTNER: Yes. I believe I am guilty. MR. GINDER: Thank you. I have nothing further. THE COURT: Mr. Plotner, quite frankly I am a little startled at your criminal conduct. However, I would like to observe you have demonstrated you are an honorable man so far as you are admitting and willing to accept the process of the law, whatever it may be." (Italics added.)

At the close of the hearing on November 27, 1967, at which it was ordered that petitioner be sent to Vacaville for a 90-day observation period, petitioner stated, in part: "[B]ased upon my belief that justice generally prevails, I pleaded guilty at the Municipal Court level, at the first opportunity that I could and, in effect, in layman's language, I placed myself at the mercy of the Court, *knowing full well* that the Court would administer whatever decision it makes in a manner consistent with the administration of justice in this state and this county." (Italics added.)

denied petitioner's motion to withdraw his pleas of guilty, stating: *"I can recall vividly the time [petitioner] entered his plea.* Both Mr. Nye and Mr. Sperbeck were here. I of course know of the reputation of both defense counsel. Mr. Nye and Mr. Sperbeck have outstanding backgrounds of criminal law. [Petitioner] has had something in excess of 25 years of practice and *there is no question in my mind that [petitioner] knew what he was doing when he entered his plea of guilty. And I think that it is more than a mere coincidence that the motion is being made at this time when it becomes obvious that Superior Court intends to sentence him to the State Penitentiary.* I have not found sufficient basis in any of the affidavits or arguments to warrant . . . granting the motion to withdraw the plea of guilty. The motion shall be and the same is hereby ordered . . . denied." (Italics added.)

At the committee hearing, petitioner's testimony concerning his use of drugs varied from his previous explanations to the probation officer, the court, Dr. Kuehnert at Vacaville, and Dr. McGaughey. He testified that seven, eight, or ten years before (sometime between 1960 and 1963) he started taking dexamyl, dexedrine, and other amphetamine derivative drugs, which had been prescribed for him to achieve weight reduction and to increase his energy. He also testified that he had used methedrine (which he equated with amphetamine drugs), but did not indicate when he started taking this drug. He denied having used barbiturates. He stated that at "some time" he graduated to a point where his tolerance to drugs had increased considerably, that he could not determine when this transition occurred, but that about three or four years before his offenses (in about 1963) he "realized that there was an addiction." At one point in his testimony, petitioner started to explain his actual condition at the time of his offenses but stopped short of a full explanation. He stated: "So that about the time this happened I was pretty much of a vegetable, *but not to the point — well, I'll stop there."* (Italics added.)

Inconsistent with petitioner's earlier unsuccessful claim that he was suffering from grossly impaired judgment at the time he made his guilty pleas, he testified at the committee hearing that his arrest "scared the life out of him" and sobered him momentarily to see what was happening to him; that at the earliest opportunity what amphetamine supply he had went down the drain; that he has not had any amphetamine drugs since the time of his arrest (which took place *seven weeks* before petitioner pleaded guilty), and that the strongest thing he has had since is aspirin, but that usually every day he has a highball after work.

At the time of the committee hearing, petitioner sought to demonstrate that he had then recovered and become rehabilitated. He introduced re-

ports obtained by him in April 1970 (each based primarily on only one interview with petitioner in that month) from Drs. McGaughey and Rapaport concerning his recovery from drug addiction. He introduced character evidence on his behalf and called as a witness his present employer, Joseph E. Smith, Esq., who testified that petitioner was a conscientious employee, was performing his duties as a law clerk "as well as any lawyer in the community would," and had given no indication that he was taking drugs in any way.

Finally, petitioner introduced in evidence a decision of a hearing examiner for the United States Department of Health, Education, and Welfare, showing that he was awarded social security disability benefits from January 1, 1966, to October 31, 1969. Although the decision itself contained no findings of mental illness, petitioner testified that that was the ground on which the award was made.[4]

*The nature of petitioner's offense of violating section 496 of the Penal Code (receiving for illicit sale $13,000 in stolen United States Savings Bonds) involved moral turpitude and inherently calls for his disbarment.*

In a handwritten statement given by petitioner to the probation officer shortly after commission of the offenses, petitioner gave a clearly exculpatory version of his involvement in the attempted sale of $13,000 in stolen United States Savings Bonds.[5] Other witnesses to the transaction, as well as petitioner's later testimony before the committee, however, disclosed that, in violating section 496 of the Penal Code, petitioner was acting as a "fence."

Petitioner had contacts with certain shoplifters and burglars in Oakland and knew where to obtain stolen property from them. When petitioner sought out such persons, allegedly to pick up stolen clothes for Mrs. Epperson, he received from them $13,000 in stolen United States Savings Bonds for sale. Petitioner immediately acted to sell the stolen bonds,

[4]It should be noted that in 1966 petitioner was engaged in private practice in Los Angeles and then in Walnut Creek; that the practice was interrupted due to a heart condition; that nevertheless his practice in Walnut Creek continued until October 1967; that petitioner advised the probation officer that his net income from the practice of law was approximately $400 to $500 per month; that petitioner was under observation at Vacaville from December 7, 1967, to February 5, 1968; and that he was committed to the Department of Corrections at Vacaville from April 5, 1968, to June 2, 1969.

[5]Among other things, petitioner stated that the bonds were given to Mrs. Epperson; that after they left the apartment, she turned the bonds over to him; that he then put them in his pocket and forgot about them until she later reminded him; and that one of the Negro men later called him and said that he was a member of the Black Muslims and that petitioner should not cross them up.

admittedly for personal gain. He communicated with John Simpson to have the latter arrange for a buyer. Petitioner later met with a government agent who was posing as a prospective buyer. The agent reported that petitioner wanted $4,800 for the bonds, that after negotiation between them $4,000 was agreed upon, and that petitioner sought a secret profit for himself and the agent by proposing that they represent to their principals that the sale was consummated for $2,000.

■ Petitioner's conviction of receiving stolen property involved moral turpitude and was an extremely serious crime for an attorney. The crime of receiving stolen property has, in fact, been considered as even more serious than the theft itself. (See *People* v. *Tatum,* 209 Cal.App.2d 179, 183-184 [2] [25 Cal.Rptr. 832].) This offense alone clearly warrants disbarment. (See *In re Lyons* (1964) Bar Misc. 2312.)

As stated by this court in *In re Smith,* 67 Cal.2d 460, 461-462 [62 Cal. Rptr. 615, 432 P.2d 231]: "In determining the appropriate degree of discipline, each case, whether a conviction, referral or original proceeding, must rest on its own facts. This court has generally disbarred attorneys who have been convicted of serious crimes, engaged in patterns of serious offenses or habitually disregarded the interests of their clients, whatever the unfortunate causes for their misconduct.

"Under Business and Professions Code sections 6101-6102, as amended in 1955, disbarments and not suspensions have been the rule rather than the exception in cases of serious crimes involving moral turpitude, the purpose of the statutes being to protect the public, as well as the courts and the legal profession."

*The facts and circumstances surrounding petitioner's offense of violating section 274 of the Penal Code (procuring an abortion) involve moral turpitude and constitute heinous misconduct for an attorney.*

At the time he pleaded guilty to violating section 274 of the Penal Code, petitioner "qualified" his plea on the asserted ground that his "activity was periphery" to the abortion. Later, in his statement to the probation officer he sought to give the impression that his involvement in the abortion was limited to putting Mrs. Epperson in touch with John Simpson because of her threats of suicide and that the arrangement for the abortion was made between Mrs. Epperson and Simpson. Mrs. Epperson contradicted petitioner and stated that she was solicited by petitioner for prostitution, that she agreed to become a prostitute in exchange for an abortion to be arranged by petitioner, and that petitioner did arrange for the abortion. Apparently, other witnesses interviewed by the probation officer corroborated Mrs. Epperson.

In his subsequent testimony before the committee, petitioner admitted that he was a "principal" in the abortion and had arranged with Simpson for the abortion. He denied, however, Mrs. Epperson's version of the transaction and claimed that he was acting from a motive of endearing himself to her for sexual favors. Petitioner told the committee that he was not present at the time of the abortion in a hotel room (which room he had apparently taken for sexual relations with Mrs. Epperson) and never saw her thereafter. In his previous statement to the probation officer, he had indicated that he returned to the hotel room just after the abortion and was aware of Mrs. Epperson's hemorrhaging but failed to obtain medical care for her because she told him her boyfriend was coming. He also stated before the committee that he had his doubts whether the person performing the abortion was a "real doctor."

It is clear that petitioner procured a "criminal abortion," as commonly defined and condemned by both medical and legal authorities. (See Health & Saf. Code, §§ 25951-25953; *People* v. *Belous,* 71 Cal.2d 954, 965-973 [80 Cal.Rptr. 354, 458 P.2d 194].) This court in *Belous* pointed out the health dangers and risks to a woman who receives a criminal abortion.

Moreover, under any version of the facts surrounding this offense, petitioner exposed his minor son to sexual acts on Mrs. Epperson, to contact with thieves, to dangerous drugs and alcohol, and to petitioner's own involvement in receiving stolen property and supplying an abortion.

 From the above, it will readily be seen that petitioner demonstrated complete indifference to the health and safety of Mrs. Epperson and to the welfare of his minor son. Under the circumstances, his conduct was of the type this court has repeatedly defined as involving moral turpitude. (*In re Alkow,* 64 Cal.2d 838, 840-841 [1b] [51 Cal.Rptr. 912, 415 P.2d 800, 21 A.L.R.3d 882]; *In re Craig,* 12 Cal.2d 93, 97 [4] [82 P.2d 442].)

 *Petitioner's crimes were not caused solely by an amphetamine addiction, but were the result of his deliberate, knowing acts; and petitioner, an experienced criminal practitioner, has sought by various deliberate maneuvers, from the time he was arrested, to avoid the foreseeable consequences in both his criminal action and this disciplinary proceeding, that is, imprisonment and disbarment.*

Petitioner's attempted showing in mitigation in this proceeding is essentially the same one he made in his criminal action in seeking to mitigate punishment and for the purpose of a belated "insanity" and "diminished capacity" defense to the charges against him. Significantly, three courts in the criminal action rejected his showing; and in the present proceeding a

majority of the board and the committee also found his showing unpersuasive. Petitioner's claim in mitigation must be viewed in the context of all the facts and circumstances. When so viewed, his claim is wholly unconvincing.

In the first place, the facts involved in petitioner's commission of his offenses speak for themselves and show conscious and deliberate acts on his part over a period of several days. Secondly, despite his various claims of a drug addiction over several years prior to his offenses, petitioner gave no indication by his behavior at any time of any lack of capacity to exercise judgment necessary to act as counsel to others. Although at one time in the committee hearing petitioner claimed that his law practice had "dwindled to practically a dribble" (apparently before he went "on welfare"), court records of the Contra Costa County Superior Court for the months of April through October 1967 show that petitioner was representing clients in numerous civil and criminal matters before that court before, during, and after the time of his offenses; and in October 1967 he told the probation officer that he was practicing law and netting approximately $400 to $500 per month from his practice. The record also shows that petitioner's present employer had known him for 25 years, but had no personal knowledge of petitioner's drug addiction. In addition, petitioner testified that his two counsel in the criminal action had known him for a number of years, but until his arrest were unaware of his drug addiction.

Furthermore, the conclusion is inescapable that, when seeking to set aside his guilty pleas between March and July 1968, petitioner sought to mislead the trial court and the Court of Appeal to delay or evade a state prison sentence. Before entering his guilty pleas, petitioner had personally sought out information regarding drug addiction commitments at the California Rehabilitation Center. He had also consulted a private psychiatrist and had reviewed with his two experienced counsel the People's case against him. Petitioner and his counsel had considered, but rejected, insanity defenses. In September 1967, at the time he made his pleas, petitioner was closely observed by the court, as well as by counsel. His answers were lucid and indicated his own experience in criminal matters and his "considered judgment" to plead guilty. Subsequently, in November 1967, at the first sentencing hearing, petitioner himself indicated that his September pleas of guilty were made knowingly by him as an experienced practitioner. Significantly, neither petitioner nor his counsel suggested at that time that petitioner was then suffering from any mental impairment or had been so suffering in September.

From the record of the first sentencing hearing, it is clear that petitioner and his counsel were seeking either probation or a nonpunitive disposition

by the court. Further, it is implicit in this background that the decision to plead guilty rested on a joint conclusion of petitioner and his counsel that an insanity or diminished capacity defense would not prevail. Clearly, they had fully explored these defenses.

 As stated by this court in *Grove* v. *State Bar,* 66 Cal.2d 680, 685 [58 Cal.Rptr. 564, 427 P.2d 164]: "We realize that in many cases psychoneurotic problems may underlie professional misconduct and moral turpitude. In this area our duty lies in the assurance that the public will be protected in the performance of the high duties of the attorney rather than in an analysis of the reasons for his delinquency. Our primary concern must be the fulfillment of proper professional standards, whatever the unfortunate cause, emotional or otherwise, for the attorney's failure to do so."

It is ordered that petitioner be disbarred from the practice of law in this state and that his name be stricken from the roll of attorneys, effective 30 days from the filing of this opinion.