[S.F. No. 22903. In Bank. May 22, 1973.]

ALBERT FRANCIS SKELLY, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

## COUNSEL

John F. Moran, P. M. Barceloux, Burton J. Goldstein, Albert E. Levy, Ralph Golub, Goldstein, Barceloux & Goldstein and M. Reed Hunter for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Christopher M. Reuss for Respondent.

## OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the disciplinary board that petitioner be disbarred.

Petitioner, a 64-year-old attorney who was admitted to practice in 1934, has no prior disciplinary record. In the instant proceeding he was charged in a notice to show cause with violating his oath and duties as an attorney (Bus. & Prof. Code, §§ 6103, 6067, 6068) and committing acts involving moral turpitude (Bus. & Prof. Code, § 6106). It was charged that in particular he gave certain sums from fees paid him by three clients (Glidden Company, General Foods Corporation and American Home Products Company) to Russell Wolden, then Assessor of the City and County of San Francisco, under the guise of referral fees with the corrupt intent to influence Wolden's action regarding assessments upon certain property to the benefit of those clients (counts one through three)[1] and that petitioner conspired with Wolden to engage in a plan whereby Wolden would refer corporations owning property subject to his assessment to petitioner as law clients and whereby petitioner would divide fees from the clients with Wolden under the guise of referral fees and whereby Wolden then would unlawfully grant favorable assessments upon the corporations' property and that in pursuance of that conspiracy petitioner and Wolden engaged in specified conduct relating to the same clients named in the other counts (count five).

Following hearings the local committee, by a vote of two to one, found that all the charges "are untrue" and recommended that the notice to show cause be dismissed.

The board did not receive any additional evidence, but, after being addressed by counsel, found: During 1960 through 1965, $77,700 was paid petitioner by Glidden, General Foods, and American Home Products as legal fees in connection with tax matters, and petitioner paid Wolden $57,000 of that amount pursuant to an arrangement between them that he would pay Wolden a substantial portion of the fees received. Wolden performed little, if any, work in connection with the cases. The three clients had property in San Francisco that was under Wolden's jurisdiction as assessor. Wolden substantially reduced the assessment of each client resulting in favorable tax treatment for them. Although denied by petitioner, it is inconceivable that petitioner was unaware of the property of his clients in San Francisco that was subject to assessment by Wolden, and petitioner knew that such property was subject to such assessment. Petitioner also knew, or should have known,

---

[1]The same charge was made in count four except that it related to Standard Brands, Incorporated. Although the board found in part that petitioner shared his legal fees received from Standard Brands with Wolden, the State Bar concedes that this finding is not sustained by the record. Petitioner denied that his fees from this client were split with Wolden, and no evidence to the contrary was introduced.

that the companies might receive favorable tax assessment treatment. Petitioner knew that Wolden was prohibited by law from engaging in any business or professional work which conflicted with his duty as assessor,[2] but nevertheless entered into an arrangement with Wolden by accepting clients referred by Wolden who had property in San Francisco that was subject to assessment and then sharing his fees from the clients with Wolden under the guise of referral fees. The board unanimously recommended that petitioner be disbarred.

In the petition for review petitioner contends that the evidence does not support many of the board's findings including, among others, that Wolden performed little, if any, work in connection with the cases of the three named clients and that petitioner knew of the property in San Francisco of those clients that was subject to assessment by Wolden.[3]

### The Facts

This proceeding arises out of petitioner's association with Wolden, who at the time of the events here in question was a member of the State Bar. Wolden was subsequently convicted on eight counts of bribery (Pen. Code, § 68) and one count of conspiracy to commit bribery (Pen. Code, 182), and the judgment was affirmed in *People* v. *Wolden* (1967) 255 Cal.App.2d 798 [63 Cal.Rptr. 467]. The essence of the charges against Wolden was that he accepted bribes to lower assessments upon property. (See *People* v. *Wolden, supra,* at p. 802.) At the instant hearings petitioner testified that Glidden, General Foods, and American Home Products "were not involved in the bribery charges" against Wolden.

At the hearings pursuant to stipulation portions of the testimony given at Wolden's trial by Max Newstat, a former deputy assessor under Wolden, were read into the record or the contents thereof were stipulated to. It appears therefrom Newstat stated that, after consultations with Wolden, Glidden and General Foods were given substantial reductions in assessed valuations for 1960 to 1965 by Wolden's office, which reductions would not have been allowed by Newstat had the decision been his to make. According to Newstat, in 1962 an auditor recommended that allowances requested by Glidden not be given for 1960 through 1962, and subse-

---

[2]According to the State Bar examiner, at the applicable time section 222 of the Charter of the City and County of San Francisco provided: "No . . . officer . . . of the City and County shall engage in any activity . . . which is inconsistent . . . or in conflict with his duties as . . . [an] official . . . of the City and County . . . ."

[3]In addition to his attack upon the findings, petitioner makes several other contentions, but it is unnecessary to consider them in view of our conclusion that there is insufficient evidence to sustain the charges.

quently no effort was made to collect a deficiency from Glidden. New-stat's testimony does not connect petitioner with the reductions given Glidden and General Foods[4] or even mention American Home Products. Newstat admitted having "lied" to the district attorney and the grand jury and having his judgment influenced on assessments by money he received.

Petitioner, who was called as a witness by the State Bar and there-after took the stand in his own behalf, testified as follows:

He attended high school and college with Wolden, and over the years they were personal friends. During a period when petitioner was a deputy city attorney, he represented Wolden as assessor at Wolden's request, and for a while petitioner was the attorney for the Wolden family. After petitioner left the city attorney's office to go into private practice Wolden referred many matters to him commencing around 1956. In 1955 when Wolden was investigated by a grand jury and exonerated he decided it was bad politically for him to practice law and told petitioner he would refer some legal matters to him. Pursuant to an informal agreement they generally split the fees in the middle although in some cases in which petitioner did a tremendous amount of work he retained over 50 percent while in other cases he remitted over 50 percent to Wolden. Also on occasion if Wolden needed extra money petitioner would give it to him and then take it out of another case. He always had maybe six or eight cases in his office referred by Wolden. In response to a subpoena by the district attorney's office petitioner reviewed his records and ascertained that over a seven-year period [which it may be inferred included the years here involved] he received 52 percent and Wolden 48 percent out of the total fees of about $240,000 of cases referred by Wolden to petitioner.

Petitioner further testified that Glidden was referred to him by Wolden in 1963 in connection with a franchise tax case in Sacramento, and peti-tioner worked on that case in 1963, 1964, and 1965. Petitioner's name, and not Wolden's, was on the retainer agreement and any billings to the client, and the same was true as to General Foods and American Home Products. During the stated three years petitioner received $25,200 from Glidden, of which amount he paid Wolden $17,500. The $25,200 was paid entirely for the foregoing tax matter and consisted of a $5,000 an-nual retainer for three years plus $10,200. At Wolden's request, petitioner

---

[4]Newstat stated that during a conversation with Wolden regarding Glidden, Newstat told Wolden he "can shoot holes full of these deductions" and asked what should be done and that Wolden replied ". . . *Let's go along with him* and with these deduc-tions. . . ." The State Bar points to the italicized statement, but the evidence does not establish to whom the "him" referred.

turned over to Wolden each of the $5,000 retainer fees plus an additional $2,500. When asked if Wolden stated why he wanted the full amount of the retainer fee, petitioner replied: "He did not, but he was sending me a lot of business, and I didn't ask any questions . . . I had a very substantial practice . . . and much of it came from Wolden. . . ." Petitioner stated that he did most of the work on the franchise tax case—that such cases were his specialty.

Petitioner also testified: Wolden referred General Foods to him in connection with personal property tax matters in Alameda County in 1962, and petitioner represented that client in those matters from 1962 through 1964. He was paid $22,500 by General Foods, of which amount he gave Wolden $18,250. He arrived at this split by retaining compensation for the time he spent on the matter each year and sending the rest to Wolden. Petitioner "would work" on the figures with a representative of that company, "put it together," and then call Wolden, who usually would say "Send it to me and I will take it from here." Wolden "would handle it from there on." Wolden was an expert in that field and was "supposed to check over [the] figures." Most of the time Wolden used a tax consultant named Bill Brothers to file the documents. Petitioner made no "inquiry to find out what action Wolden had taken on the assessments."

Petitioner further testified: Wolden referred American Home Products to him in connection with personal property tax matters in Alameda County, and for work done from 1961 to 1964 petitioner received from that company $30,000, of which amount he paid Wolden $23,000. He arrived at this split in the same manner as that relating to General Foods, and he and Wolden handled the matters in the same way as that involving General Foods. According to his recollection of Newstat's testimony, the assessment for American Home Products' assets in San Francisco had been greatly reduced.

Petitioner denied knowing at the time he represented Glidden, General Foods and American Home Products that they "were filing in San Francisco"[5] and denied that he had any understanding with Wolden that any

---

[5]With respect to Glidden, petitioner also testified (1) that, although he was raised in San Francisco and practiced law here, he did not know at the time he was representing Glidden that his client had property in San Francisco and (2) that he did not learn until the time of the Wolden trial that Glidden was "filing in San Francisco." Petitioner stated that he had been positive Glidden did not have property in San Francisco because he "assumed they would have discussed it with me."

The State Bar alleges that the assessor's records show that in 1963 through 1965 Glidden owned a paint factory that occupied almost a square block at 1300 and 1400 Seventh Street and 1000 and 1006 Sixth Street in San Francisco, and the State Bar

consideration in the form of reduction in assessments of the three clients would flow by reason of his sharing the fees from the clients with Wolden.

Petitioner further testified: Representatives of the district attorney's office checked petitioner's records before the Wolden trial and asked "these companies in the east" (presumably the three clients in question) what these sums were paid for, and petitioner never heard that any consideration was given by the federal or state government to having him charged with bribery or conspiracy. Also petitioner's income tax returns show that he made the payments to Wolden, and petitioner was audited yearly for 10 years and reaudited "when the Wolden case was coming up" and was "cleared each time" by the Internal Revenue Service.

From Newstat's statements and petitioner's testimony it further appears that during the period petitioner shared fees with Wolden petitioner represented in Wolden's office three other clients (Standard Brands, Worthington Corporation, and Victor Equipment Company), all of whom received reduced assessments. Petitioner did not give Wolden any of the fees received from these clients.

At the hearings petitioner presented evidence of his good character.[6] He also testified that Wolden "was entitled to practice law as long as there was no conflict of interest in his office." It was further stipulated that if called to testify Judge Ray O'Connor would testify that Wolden could practice law outside of San Francisco.

### Whether Evidence Sustains Charges

■ Charges of unprofessional conduct on the part of an attorney should be sustained by convincing proof and to a reasonable certainty. (*Bodisco* v. *State Bar,* 58 Cal.2d 495, 497 [24 Cal.Rptr. 835, 374 P.2d 803]; *Black* v. *State Bar,* 57 Cal.2d 219, 222 [18 Cal.Rptr. 518, 368 P.2d 118].) Any reasonable doubts should be resolved in favor of the accused, and if equally reasonable inferences may be drawn from a fact, the in-

suggests that we take judicial notice of those alleged facts (see Evid. Code, §§ 452, subd. (h), 459). However, even if we could, and did, take judicial notice of those facts, they would not show that petitioner was aware of that factory.

[6]Judge Raymond Arata, who had known petitioner over 30 years, when asked, "What would you say [petitioner's] reputation for truth, honesty and integrity was and is?" replied, "Very good." Judge Edward O'Day and George Cronin, a partner in Brobeck, Phleger, and Harrison, both of whom had known petitioner for many years, gave testimony of a similar character, and a favorable letter regarding petitioner's integrity from Reverend Charles Dullea, the president of the University of San Francisco, was also introduced. In addition it was stipulated that if called to testify several other named persons would testify as to petitioner's good reputation for honesty and integrity.

ference which leads to a conclusion of innocence rather than one leading to a conclusion of guilt will be accepted. (*Vaughn* v. *State Bar,* 6 Cal.3d 847, 852 [100 Cal.Rptr. 713, 494 P.2d 1257]; *Himmel* v. *State Bar,* 4 Cal.3d 786, 793-794 [94 Cal.Rptr. 825, 484 P.2d 993].)

The findings of the local committee and the board are, or course, not binding on this court, which will weigh the evidence and pass upon its sufficiency. (*Black* v. *State Bar,* 7 Cal.3d 676, 683 [103 Cal.Rptr. 288, 499 P.2d 968]; *Bodisco* v. *State Bar, supra,* 58 Cal.2d 495, 497.) "Since it is difficult to pass upon the weight to be given the testimony of a witness when only the written record is before a reviewing body, it is proper to give great weight to the action of the local administrative committee which heard the witnesses and which was in a better position than the Board . . . or this court to pass upon the truthfulness of the testimony. (*Browne* v. *State Bar,* . . . 45 Cal.2d at p. 170 [287 P.2d 745]; *Werner* v. *State Bar,* 13 Cal.2d 666, 676-677 [91 P.2d 881].)" (*Brawner* v. *State Bar,* 48 Cal.2d 814, 818-819 [313 P.2d 1].)

Under the foregoing standards we are of the view that the evidence is insufficient to sustain the charges against petitioner. Insofar as the first three counts are concerned, petitioner admittedly gave Wolden approximately three-fourths of specified fees paid him by Glidden, General Foods, and American Home Products, but in our opinion it was not adequately proven that petitioner did so with the corrupt intent of influencing Wolden's action regarding assessments upon property in San Francisco to the benefit of those companies or that petitioner even knew at the time he was representing those companies that they had property in San Francisco that was subject to assessment by Wolden.

The State Bar's evidence consists primarily of the prior testimony of Newstat and petitioner's own testimony. Although the evidence discloses a number of suspicious circumstances, petitioner's explanations, if believed, exonerate him of the charges.

According to the prior testimony of Newstat, after consultations with Wolden, Glidden and General Foods received reduced assessments from Wolden's office commencing in 1960,[7] and Newstat would not have allowed the reductions had the decision been his to make. Petitioner admitted having a long and close relationship with Wolden before Wolden's conviction on bribery and conspiracy charges. Petitioner also admitted doing most of the work in the Glidden franchise tax matter and yet giving Wolden most of the fee paid by that company. As appears from the re-

---

[7]It was not until 1962 and 1963 that those companies were referred by Wolden to petitioner.

cited evidence, the amount of work Wolden did on the Alameda County personal property tax matters of General Foods and American Home Products is not clearly established, but even if the amount of work he performed did not justify the percentage of the fees he received, the foregoing would constitute merely further suspicious circumstances insofar as the present charges are concerned.[8]

Petitioner explained that he had an informal agreement with Wolden under which they divided evenly the fees of the cases referred to him by Wolden, although in individual cases the split might differ depending upon the work performed and Wolden's need for money and that over a seven-year period petitioner received 52 percent of the fees of cases referred to him by Wolden. It may be inferred from the heretofore recited facts that petitioner agreed to the split in order to get the referrals and out of friendship for Wolden.[9]

Petitioner further explained that at the time he represented the three companies concerning the franchise tax case in Sacramento and personal property tax matters in Alameda County he did not know that they were filing concerning property in San Francisco. Although the board found that he knew of those companies' property in San Francisco that was subject to assessment by Wolden, there is no direct evidence of such knowledge, and it does not appear from the recited facts that there is sufficient circumstantial evidence thereof to remove all reasonable doubts on that issue.

---

[8]Petitioner was not charged with splitting legal fees in a manner that was not in proportion to the services performed or responsibility assumed by each. In this connection it may be noted that in 1972 rule 22, Rules of Professional Conduct, was adopted which prohibits a member of the State Bar from dividing a fee for legal services with another attorney who is not a partner in or an associate of his law firm or law office unless, among other things, the division is made in proportion to the services performed or responsibility assumed by each. Rule 22 had its origin in Disciplinary Rule 2-107 of the American Bar Association Code of Professional Responsibility (see 47 State Bar J. 138), and rule 2-107 was based on former canon 34 of the Canons of Professional Ethics of that association (see generally 1 Witkin, Cal. Procedure (2d ed. 1970) pp. 80-81.)

[9]Although *People* v. *Wolden, supra,* 255 Cal.App.2d 798, 804-805, in discussing a claim that it was error to instruct that Skelly and certain other witnesses were not accomplices, states, inter alia, that Skelly and two other witnesses "exemplified both characteristics of the bribe giver" and "Any inference that any of the three acted from motives of philanthropy or friendship would be completely unreasonable on all the evidence," the face of the opinion does not show that the statements were made in connection with Skelly's conduct relating to the clients named in the instant charges, and in any event all the evidence at the Wolden trial is not before us and on the evidence presented at the instant hearings it is completely reasonable to infer that Skelly agreed to the split out of his long professional association with and friendship for Wolden and in order to get the referrals of clients.

A majority of the local committee, which heard the testimony and had an opportunity to observe petitioner while testifying, evidently believed his explanations, since that majority exonerated him of the charges. The district attorney's office reviewed petitioner's records and contacted the companies, and it may be inferred that office found insufficient proof to bring bribery and conspiracy charges against petitioner. The record of petitioner has heretofore been unblemished during his 39 years as a member of the State Bar, and his reputation for honesty and integrity is good. We conclude that the charges in the first three counts were not adequately proven.

The charge in count four involving Standard Brands is also not sustained by the record as is conceded by the State Bar, and in our opinion the heretofore recited evidence is insufficient proof that petitioner conspired with Wolden to engage in the common plan alleged in count five.

Since, as hereinabove indicated, it is the conclusion of this court that none of the charges in the notice to show cause is sufficiently supported by the evidence, this proceeding is dismissed.

**McCOMB, J.**—I dissent. As has been pointed out by this court on innumerable occasions (see, e.g., *In re Plotner,* 5 Cal.3d 714, 716 (1) [97 Cal.Rptr. 193, 488 P.2d 385]), the burden is on petitioner to show that the disciplinary board's recommendation is erroneous or unlawful. In my opinion, petitioner has not met this burden.

The majority state: "Insofar as the first three counts are concerned, petitioner admittedly gave Wolden approximately three-fourths of specified fees paid him by Glidden, General Foods, and American Home Products, but in our opinion it was not adequately proven that petitioner did so with the corrupt intent of influencing Wolden's action regarding assessments upon property in San Francisco to the benefit of those companies or that petitioner even knew at the time he was representing those companies that they had property in San Francisco that was subject to assessment by Wolden.

"The State Bar's evidence consists primarily of the prior testimony of Newstat and petitioner's own testimony. Although the evidence discloses a number of suspicious circumstances, petitioner's explanations, if believed, exonerate him of the charges."

As I see it, additional suspicious circumstances, not pointed to by the majority, amply warrant the findings made by the disciplinary board, as

a result of which the board's recommendation of disbarment should be followed.

Petitioner testified that Wolden *introduced* him to the particular individuals from the corporations. In an exhibit to his answer to the original notice to show cause, petitioner lists the corporations' representatives with whom he dealt, as follows:

### 1. GLIDDEN COMPANY.

All of [petitioner's] dealings were with Donald E. Erskine, controller, 900 Union Congress Building, Cleveland, Ohio.

### 2. GENERAL FOODS CORP.

Most of [petitioner's] dealings were with John Reynaud, manager of the property tax department, 250 North Street, White Plains, New York. The contract signed with this Company was handled by Mr. Parrington of the tax department.

### 3. AMERICAN HOME PRODUCTS.

[Petitioner] dealt with Robert Greenlaw, now treasurer and formerly head of the tax department. Also, Assistant Charles Canevari, manager of the tax department, 685 Third Avenue, New York City, New York.

### 4. STANDARD BRANDS INC.

[Petitioner] dealt with Ed S. Short, who would visit him a couple of times a year. Mr. Short is now retired, residing at R.F.D. 2, Oyster Bay, Soundview and Harbor Road, New York.

In the points and authorities filed by petitioner with the local committee, he alleges, as follows: "It also appears from Newstat's testimony that the following companies were represented by tax men from the East, *who visited here* [*in San Francisco*] *with Wolden:*

| I. GLIDDEN | — Mr. Erskine, Koberg (pg 602) |
| II. GENERAL FOODS | — Mr. Reynaud (pg 628) |
| IV. STANDARD BRANDS | — Mr. Short (pgs 554, 562)" (Italics added.) |

It is inconceivable to me that representatives from these corporations would have contacted Wolden in person in San Francisco for the sole purpose of obtaining a recommendation from him of an attorney to handle matters for them elsewhere in California. They were all apparently

from the East or Mid-West; and their coming to San Francisco and having personal meetings with Wolden would suggest to the normal person, I believe, that at least some of them had business dealings with him on behalf of the corporations they represented with respect to property owned by the corporations in San Francisco. Furthermore, in view of petitioner's very close relationship to Wolden and his acknowledging that Wolden introduced him to the representatives with whom he later dealt, it is reasonable to conclude that petitioner was aware of the fact that the above named persons visited in San Francisco with Wolden and undoubtedly had business dealings with him regarding the assessment of property owned by the respective corporations there and that part of the so-called "referral fees" petitioner turned over to Wolden constituted a bribe to him to give favorable tax treatment to the corporations involved.

In his answer to the amended order to show cause, petitioner specifically alleges that "GLIDDEN COMPANY was not filed for by [petitioner], but by Mr. Erskine, and Mr. Hoberg. . . .

"As To GENERAL FOODS, the evidence is that a Mr. Reynaud came out here from the East and *had many discussions with* WOLDEN and he had actually filed for GENERAL FOODS." (Italics added.)

It will be noted that two of the persons who, according to petitioner's allegations, filed on behalf of Glidden and General Foods in Wolden's office for property belonging to those corporations in San Francisco (one of whom he admitted "had many discussions" with Wolden) were two of the persons petitioner testified he dealt with in the tax matters he handled for Glidden and General Foods.

As pointed out in the majority opinion, the record shows that during 1963 through 1965 petitioner handled a franchise tax matter for Glidden in Sacramento, receiving fees totaling $25,200, of which he paid Wolden $17,500; that during 1962 through 1964 he handled tax matters for General Foods relating to the company's personal property in Alameda County, receiving fees totaling $22,500, of which he paid Wolden $18,250; and that during 1961 through 1964 he handled tax matters for American Home Products relating to that company's personal property in Alameda County, receiving fees totaling $30,000, of which he paid Wolden $23,000.

With respect to his work relating to the personal property tax matters in Alameda County, petitioner testified: "THE CHAIRMAN: In other words, your work consisted then entirely of what you did in your own office which included any contacts with the clients. THE WITNESS: Yes, and pre-

paring the figures and the deductions and that. THE CHAIRMAN: And the preparation of the pertinent documents? THE WITNESS: Yes, sir." Petitioner further testified that when he completed his work, he would telephone Wolden, who would direct petitioner to send the papers to him and would tell him he would "take it from there." Petitioner said that Wolden had Bill Brothers do the actual filing.

According to petitioner's testimony, he made no effort to find out what action Wolden took or what results were achieved in Alameda County on behalf of his clients. Thus, he testified: "THE CHAIRMAN: And he [Wolden] stated to you that he would attend to them [the General Foods and American Home Products personal property tax matters] personally? THE WITNESS: He said, 'I will take it from there,' was his expression. THE CHAIRMAN: Did you follow up on them at all or check to see what the outcome was? THE WITNESS: No, sir. THE CHAIRMAN: Did you learn anything afterwards as to what the result was of the application? THE WITNESS: Yes, I did, as far as American Home is concerned. THE CHAIRMAN: Who advised you about those results? THE WITNESS: What happened on that was when Bill Brothers was being investigated by the Grand Jury *in Alameda County*—THE CHAIRMAN: Just before this came up, did you learn about what the results of the assessments were? THE WITNESS: No, sir. THE CHAIRMAN: You did not know about it at all until after the case broke, as it were? THE WITNESS: Yes, sir. THE CHAIRMAN: Did you make any inquiry to find out what action Wolden had taken on the assessments? THE WITNESS: No, sir." (Italics added.)

Petitioner further testified: "THE CHAIRMAN: Is it your testimony that at no time did you know of or were you made aware of the reduction of the assessment for any of these clients that you had represented? THE WITNESS: In Alameda County? THE CHAIRMAN: *In Alameda County*. THE WITNESS: The only thing I knew were the deductions which we worked up which we felt they were entitled to, in other words, deductions from total cost of inventory. They were legitimate deductions that they were entitled to, and that is all I knew." (Italics added.)

Petitioner also testified that he forwarded Wolden $18,250 of the $22,500 paid to him by General Foods and paid Wolden $23,000 of the $30,000 paid to him by American Home Products, because in those two cases he kept track of the time he had spent working on the clients' matters and retained an amount sufficient to compensate him for his time, turning the balance over to Wolden. As hereinabove indicated, petitioner made no effort to find out how much work, if any, Wolden did. This fact would suggest to the normal person that petitioner did not want to have personal knowledge of how very little work Wolden apparently spent on

the cases,[1] so that he could hide his head in the sand, so to speak, and deny that he knew that Wolden, although receiving approximately three-fourths of the fees, actually did almost none of the work.[2]

I find it unthinkable that a reputable attorney would do the rather minimal amount of work performed by petitioner, as described by him, with respect to the personal property tax matters, seeking reductions in behalf of a client, and then have the audacity to bill the client in substantial amounts for his services (a total of $22,500 for work on one client's assessment matters for three years and a total of $30,000 for work on another client's assessment matters for five years) without ascertaining what results had been accomplished in the client's behalf.

Accordingly, in my opinion, petitioner has shown himself unworthy of belief; and the disciplinary board properly concluded that, in spite of his denials, he had knowledge (1) that Glidden, General Foods, and American Home Products were required to file in San Francisco and (2) that they received substantial reductions in their assessments there after petitioner had forwarded "referral fees" to Wolden, allegedly for the latter's share of fees received by petitioner from the corporations relating to work in Sacramento or Alameda County.

The position of the disciplinary board is fortified by factual determinations of the trial court in the *Wolden* criminal case and by the Court of Appeal in *People* v. *Wolden,* 225 Cal.App.2d 798 [63 Cal.Rptr. 467]. In the proceedings before the Court of Appeal, the basic issue was not sufficiency of the evidence as to the guilt of Wolden, but whether this petitioner and three other witnesses required corroboration under Penal Code section 1111 because they were accomplices. Presiding Justice Draper for a unanimous court noted that another attorney "and Skelly had full title to the fees from which they paid defendant and could be found to intend the payments to influence his official actions toward their clients, thus maintaining the flow of fees to them . . . [they] exemplified both characteristics of the bribe giver—each paid his own funds and each sought

---

[1]The disciplinary board found, among other things, that "Russell L. Wolden performed little, if any, work in connection with said cases."

[2]Again inconceivably, petitioner denied knowledge of what results had been achieved with respect to the personal property tax matters he handled for two clients on whose behalf he sought reductions in the assessments against them in San Francisco and from whom he received fees which, admittedly, he did not share with Wolden. In this respect, he testified: "THE CHAIRMAN: When did you learn, however, that their assessments had been reduced? THE WITNESS: I don't know if the assessments were reduced. The only thing I knew is what Newstadt testified to. Now, what the reductions were or what the deductions were they were entitled to, I don't know anything about it."

a personal benefit from the official action sought to be induced by the gift. Any inference that any of the three acted from motives of philanthrophy or friendship would be completely unreasonable on all the evidence." In sum, the Court of Appeal found that this petitioner was not an accomplice and did not need to be corroborated, because he was a bribe giver, not a bribe taker, and "the two crimes require different motives" (*id.,* p. 804). We are here concerned not with a crime per se but with the moral turpitude of a member of the bar, and in this context the moral deficiency of the bribe giver is little different from that of the taker.

Under the circumstances, I would order petitioner's disbarment, in accordance with the recommendation of the disciplinary board.

Mosk, J., concurred.