[L.A. No. 30344. In Bank. Feb. 11, 1975.]

In re RICHARD DISTEFANO on Disbarment.

## COUNSEL

Joe Ingber for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

## OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar that Richard Distefano be disbarred.

Distefano, a 33-year-old attorney admitted to practice in 1967, pleaded guilty in 1972 in the United States District Court for the Central District of California to three counts of violating 18 United States Code section 287, which provides, "Whoever makes or presents . . . to any department . . . [of the United States], any claim . . . against the United States . . . knowing such claim to be false, fictitious, or fraudulent" shall be punished in a specified manner. Pursuant to a plea bargain the prosecution moved to dismiss 10 additional counts charging violations of the same section, and the motion was granted. The federal court placed Distefano on probation for five years on each count to run concurrently on specified conditions, which included the restitution of $4,194.18 and submission to psychiatric treatment.

In 1973 we placed Distefano on interim suspension since the offenses involved moral turpitude (see Bus. & Prof. Code, § 6102, subd. (a)), and, after the judgment of conviction became final, we referred the matter to the State Bar on the issue of discipline.

Following an evidentiary hearing, both the local committee and the board unanimously recommended disbarment. The board further recommended that Distefano be ordered to comply with rule 955, California Rules of Court.

The board's findings may be summarized as follows, with certain supplementary facts added thereto in brackets:

Commencing in 1969 Distefano furnished a friend with food, rent, automobiles, and cash and continued to do so through most of 1972 except for brief intermissions. Distefano apparently was unable to resist any request from the friend for money or other material aid, and in order to finance such advances and purchases Distefano incurred substantial debts, which constituted an ever-increasing drain on his resources, to the point where most of his salary from the practice of law was devoted to debt service.

Although initially refusing, Distefano subsequently was induced by the friend to participate in a plan to defraud the United States by filing false income tax returns with claims for refund. The proceeds of the

scheme were to be used to discharge the accumulated debts. In furtherance of the plan Distefano, in 1971 and 1972, prepared and filed with the Internal Revenue Service 13 federal income tax returns under various names. The returns constituted claims for refund of taxes. The claims ranged from $663.50 to $1,730.80 and represented sums allegedly withheld from the wages of the named persons. The aggregate claims exceeded $16,000. The returns were false in every particular except that the persons named in the returns were living persons and their actual social security numbers were used. Distefano personally signed many of the returns, which he had prepared, with full knowledge that he lacked authority to sign them.

 [It was stipulated that: Distefano "wilfully and knowingly" filed the 13 "false and fraudulent income tax returns," which were the subject of the 13 counts, and that most of the returns were prepared without the knowledge or consent of the persons named therein, one of whom was a client of Distefano in 1971. A probation report discloses that Distefano personally prepared fictitious W-2 wage earning statements, which accompanied the false tax returns.]

While Distefano prepared and filed the returns in the hope that he would receive funds to reduce his indebtedness, he did not actually receive any such benefit. [It was stipulated that refund checks totaling $4,194.18 were issued by the Internal Revenue Service and negotiated. The stipulation is silent as to the identity of the person who negotiated them except that it appears therefrom that Distefano delivered one such check for $1,037 to his friend knowing that the latter would thereafter try to negotiate it. According to the probation report, Distefano reported that the friend spent the $4,194.18. It was further stipulated that two additional refund checks totaling $3,361.07 were issued by the Internal Revenue Service, endorsed by Distefano without authority from the payees to do so, and sold by him at a discount to an undercover agent. Distefano testified that the money he received for the checks was recovered from him when he was arrested.]

[Several witnesses called by Distefano gave testimony in his favor. His brother and a distant relative testified that apart from the instant offenses they knew of no occasion in which Distefano's honesty had been questioned. An attorney whose firm employed Distefano from May 1970 to May 1972, testified that Distefano competently handled all files turned over to him; that, after learning of Distefano's arrest, the firm continued to employ him, although he was told his work might be watched more closely; and that he voluntarily left the firm two months later. Another

attorney who had known Distefano about six years, testified that he believed Distefano's reputation for honesty was good, that Distefano "lived up to oral settlement agreements" with the attorney, and that the offenses were out of character with the person the attorney believed he knew. A dentist, testified that as a commanding officer in the Army Reserves he had immediate supervision of Distefano, who was a captain in the Reserves; that Distefano's performance of his responsibilities in the Reserves was better than that of any other officer; that, after Distefano told him of the criminal charges, Distefano continued to handle checks and cash as a payroll officer; and that the dentist "would trust him completely." A civilian aide in the Army gave similar testimony concerning Distefano's conduct in the Reserves.]

[In addition the probation report shows that Distefano was employed from May 1972 to the date of the report (November 1972) as an attorney by the Model Cities Center for Law and Justice in Los Angeles and that the executive director there commented favorably regarding Distefano's performance of his duties.]

Distefano accepts the board's findings but asserts that in view of certain allegedly mitigating matters and the discipline imposed in other cases he should be suspended rather than disbarred. He also asserts that the local committee erred in sustaining an objection to a question he asked one of his witnesses, but it is clear he was not prejudiced by the ruling since the question pertained to an insignificant matter.

Although we, of course, have the final word as to the discipline to be imposed, the recommendation of the board is given great weight (*Schullman* v. *State Bar,* 10 Cal.3d 526, 540 [111 Cal.Rptr. 161, 516 P.2d 865]), and the burden is on Distefano to show that the board's recommendation is erroneous or unlawful (*In re Plotner,* 5 Cal.3d 714, 716 [97 Cal.Rptr. 193, 488 P.2d 385]). In our opinion he has not sustained that burden.

Distefano has not previously been disciplined. That fact is in his favor. (See, e.g., *Sampson* v. *State Bar,* 12 Cal.3d 70, 84 [115 Cal.Rptr. 43, 524 P.2d 139]; *Himmel* v. *State Bar,* 4 Cal.3d 786, 799 [94 Cal.Rptr. 825, 484 P.2d 993].) However, he was a member of the Bar only about four years when he began to commit the instant offenses.

Distefano points to (1) testimony that his friend was "extremely persuasive" and (2) the findings indicating that Distefano apparently was under the friend's influence, that at the time of the offenses Distefano

had many debts, and that Distefano's motive for the offenses was to pay the debts. Although these factors may explain his actions, they neither justify the actions nor exonerate him. With respect to his claim of financial difficulties, it may be noted that during the period involved he was single, lived with his parents, and earned $1,100 a month from practicing law.

Distefano next points to the favorable testimony of his witnesses hereinabove summarized. It appears therefrom that apart from the misconduct involved in the instant offenses he has acted in a satisfactory manner. However, the misconduct was of an aggravated nature involving successive deliberate fraudulent acts, including forgery, extending over a substantial period (1971-1972). He manifestly was not qualified by character to be a member of the Bar at the time of the misconduct.

A 1973 letter from a psychiatrist states in part that Distefano "seems to have undergone corrective emotional experience which will allow him to *hopefully* function at a higher level than before, as soon as his depression lifts and as soon as immediate problem with the law finds its solution." (Italics added.) In addition, Distefano has indicated repentance and stated that "if given another opportunity [he] would never do anything wrong again." While this expression is commendable, we believe that the burden properly must rest on him to prove by a sustained course of good conduct that he has attained a standard of character which entitles him to be a member of the Bar.

The fact that the trial court in the criminal action dealt leniently with Distefano does not demonstrate that disbarment is excessive discipline. The trial court was dealing with him as a citizen, whereas we are dealing with him as a lawyer. As we have previously observed, the responsibilities of a lawyer differ from those of a layman; "Correspondingly, our duty to the public and to the lawyers of the state in this respect differs from that of the trial judge in administering criminal law." (See *In re Allen,* 52 Cal.2d 762, 767-768 [344 P.2d 609].)

In support of his contention that disbarment is not a fair penalty for his misconduct, Distefano cites *In re Hallinan,* 48 Cal.2d 52 [307 P.2d 1], wherein an attorney, who had a prior disciplinary record, was suspended for three years following his conviction on several counts of violating former section 145, subdivision (b), of the Internal Revenue Code by "wilfully and knowingly filing false and fraudulent income tax returns." It should be noted, however, that in *Hallinan* the attorney's own income tax returns were involved, whereas the instant case involves

the filing by Distefano of returns under the names of third parties (in most instances without their knowledge or consent) and his forgery of some of the returns, W-2 forms, and refund checks. Distefano's misconduct could well have subjected innocent third parties to investigation by the Internal Revenue Service and was of an even more aggravated nature than the misconduct involved in *Hallinan.*

Distefano also cites numerous out-of-state cases wherein attorneys convicted of various tax offenses were suspended or censured under the circumstances therein appearing. Most of the cases involved the attorney's own returns. Furthermore, in determining the appropriate discipline each case must rest on its own facts (*In re Smith,* 67 Cal.2d 460, 461-462 [62 Cal.Rptr. 615, 432 P.2d 231]), and on the facts of this case disbarment, as unanimously recommended by both the board and the local committee, appears amply warranted.

It is therefore ordered that Distefano be disbarred from the practice of law in this state and that his name be stricken from the roll of attorneys. It is also ordered that he comply with rule 955 of the California Rules of Court and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days respectively, after the effective date of this order. This order is effective 30 days after the filing of this opinion.