[L.A. No. 30448. In Bank. Dec. 22, 1975.]

In re ALVIN E. HONOROFF on Disbarment.

## Counsel

Alvin E. Honoroff, in pro. per., and Harold Rhoden for Petitioner.

Herbert M. Rosenthal and Judith A. Trice for Respondent.

## Opinion

**THE COURT.**—Petitioner seeks review of a recommendation of the Disciplinary Board of the State Bar (board) that he be disbarred. He was admitted to practice in Illinois in 1943 and in this state in 1950. He has previously been disciplined here.

In 1973 petitioner was convicted, on his guilty plea, of one count of grand theft, in violation of section 487, subdivision 1, of the Penal Code. He and two codefendants were charged with grand theft in eight counts alleging thefts from eight different insurance companies over a period of almost a year and a half. The information filed against petitioner and his codefendants alleged a scheme to defraud insurance companies by filing

false claims for medical bills and lost wages by various persons. The insurance companies paid $55,490 in settling the claims.

Petitioner's plea of guilty to one count was the result of plea bargaining negotiations, in which it was agreed that the remaining counts would be dismissed and that petitioner would not have to serve any time in custody but would be placed on probation, pay a fine of $10,000 plus penalty assessment, and make restitution through his probation officer to the insurance companies involved in the total sum of $45,290.[1]

Petitioner stresses that he was found guilty of only one count of grand theft and denies that he was criminally involved in the others. However, petitioner was ordered to make restitution to the insurance companies named in each of the eight counts filed against him, and in a letter to the superior court judge who presided at his court hearing he stated that he freely admitted that he had committed theft and that "[t]he money that I realized from these corrupt practices (my share *of the $55,000* [the total which the eight counts alleged had been taken from the insurance companies by fraud] was approximately 25% of the total sum), was poor payment indeed . . . ." (Italics added.) Thus, petitioner has admitted that he was involved in the crimes charged in each of the eight counts. Furthermore, in the same letter petitioner stated: "Frankly, as far as the facts are concerned of the individual counts which I have been charged with, my mind is a blur. I freely admit that I did wrong, but as to the details of each count, I am not even sure of them. However, *I realize that I am responsible for these acts* and even though I did not receive a great deal of this money, I have agreed to make restitution in full on behalf of the others who are not able to do so." (Italics added.)

At one point petitioner told his probation officer that at first he did not realize that some of the claims had been fabricated, but that later, upon making the discovery, he "condoned it and went along with it." Petitioner testified, however, that he was a sole practitioner, that all the settlement payments were processed through his trust account, and that he was the only person authorized to sign checks drawn on that account.

According to the probation officer's report, an insurance investigator had concluded, based upon his investigation, that the claims contained in the felony complaint against petitioner represented only "the tip of the iceberg" as far as petitioner's illegal actions were concerned. In the

---

[1]Petitioner's codefendants pled nolo contendere; and one of them, a licensed physician, was ordered, among other things, to make restitution in the sum of $10,200.

report it is stated: "[Petitioner] was the key figure in a carefully executed series of transactions in which insurance companies were defrauded. The crimes were elaborate and were carried out with that degree of sophistication which only a lawyer experienced in personal injury work could possess."

Petitioner testified before the local administrative committee that in one or two of the cases the claims resulted from adding fictitious claimants in legitimate accidents, but that at least seven of the accidents had been "staged" over a period of about a year. He explained that in the beginning his secretary would "manufacture" the required medical reports, but that subsequently the doctor was willing to prepare them.

Petitioner further admitted to his probation officer that about five years previously he had been arrested for petty theft, a crime involving moral turpitude (see *In re Rothrock,* 25 Cal.2d 588, 590-592 [154 P.2d 392]) as the result of an act of shoplifting and that in connection therewith he had given a false name, thus violating his oath and duties as an attorney (Bus. & Prof. Code, § 6068).

Petitioner presented evidence that he had been under great emotional strain at the time he committed the illegal acts, and he sought consideration thereof as mitigating circumstances.[2]

Petitioner's guilty plea was entered February 20, 1973. At that time he owned eight apartment buildings jointly with his ex-wife, his equity therein being approximately $246,000. In addition, early in 1973 petitioner purchased a residence with his present wife at a minimum of $110,000, and the value of his own equity therein as of June 19, 1974, the time of the local administrative committee's hearing, was approximately $30,000.

At the hearing petitioner's probation officer testified that petitioner received a total income of $17,700 from May 1973 through April 1974, which income was derived from petitioner's interest in the apartment

---

[2]The factors which allegedly caused petitioner's emotional stress were: (1) In 1966 his older son suffered a psychotic breakdown and had to be institutionalized during the next five years; (2) both of his sons became involved in the use of narcotics; (3) both his mother and his grandmother died; (4) in 1969 he and his wife separated, and dealing with the unhappiness which the separation caused his young daughter was extremely difficult for him; (5) as a result of these occurrences, he and the other members of his family required psychiatric care; and (6) because of the emotional difficulties, he began to gamble very heavily and neglected the administration of his law office.

buildings owned jointly with his ex-wife and money still owed him in his law practice. Petitioner himself testified that his income averaged $1,100 per month, but that he was required to pay $450 a month in alimony and child support and that the balance was insufficient to maintain his residence. He also said that he contributed some support weekly to his older son, who was "receiving state aid."

At the time of the hearing petitioner had not liquidated any of the properties owned by him jointly with his ex-wife and had apparently been unable to agree with her on a division in kind. By the time of the hearing petitioner had put his residence on the market for sale, but no sale had been effected. At that time petitioner still owed his fine and penalty assessment ($12,500) and $32,890 in restitution payments.[3] The hearing, incidentally, was held almost a year and three months from the date petitioner was placed on probation and ordered to pay his fine and penalty and make restitution.

On December 6, 1974, almost six months after the hearing before the local administrative committee, petitioner asked permission to present new evidence regarding the sale of his residence and further restitution payments made by him. He indicated that he had made restitution to each of the victims except Allstate Insurance Company, to which he owed $7,500. He also represented that he had effected a division of the properties formerly held jointly with his ex-wife and as a result solely owned three apartment buildings, which he had placed on the market for sale so that he could make the balance of the payments required of him. The board's hearing was held on June 16, 1975, and petitioner was permitted to introduce the evidence at that hearing. Since that time petitioner has made restitution to Allstate Insurance Company, and he has paid in full the fine assessed against him.

Both the local administrative committee, which saw and heard the witnesses, and the board found that petitioner had been involved in multiple instances of theft by defrauding insurance companies. The three-member local administrative committee unanimously recommend-

---

[3]Petitioner had paid two of the insurance companies defrauded, but in each instance his payment represented a negotiated compromise. One company, to which petitioner had been ordered to pay $6,400, accepted $3,750 in settlement; and another, to which petitioner had been ordered to pay $6,000, accepted $4,071.50 in settlement. Thus, although petitioner's payments reduced the amount of the restitution he was required to make by $12,400, he actually paid only $7,821.50.

ed that petitioner be disbarred. The board, by a vote of eight to six, recommended that he be disbarred.[4]

■ Petitioner contends that the recommended discipline is too severe. However, the burden is on petitioner to show that the board's recommendation is erroneous or unlawful (*In re Bogart*, 9 Cal.3d 743, 748 (1) [108 Cal.Rptr. 815, 511 P.2d 1167]; *In re Plotner*, 5 Cal.3d 714, 716 (1) [97 Cal.Rptr. 193, 488 P.2d 385]), and he has failed to meet this burden.

The crime of which petitioner was convicted is a serious crime involving moral turpitude (*In re Greenstein*, 14 Cal.3d 387, 389 [121 Cal.Rptr. 255, 534 P.2d 1335]); and disbarments, rather than suspension, have been the rule, rather than the exception, in such cases (*In re Bogart*, *supra*, 9 Cal.3d 743, 748 (3)).

Petitioner points to his evidence of allegedly mitigating circumstances and urges that he should be suspended rather than disbarred. Those factors were no doubt the basis upon which the agreement that petitioner should not be required to serve any time in custody was made. However, they are not sufficient to justify making an exception and ordering suspension instead of disbarment.

Furthermore, in 1958 petitioner was suspended for nine months for solicitation of professional employment, in violation of the Rules of Professional Conduct; and such prior discipline should be considered in these proceedings even though it was imposed some years ago. (*Alkow* v. *State Bar*, 3 Cal.3d 924, 936 [92 Cal.Rptr. 278, 479 P.2d 638].) The facts surrounding petitioner's misconduct are set forth in detail in *Honoroff* v. *State Bar*, 50 Cal.2d 202, where this court said at page 210 [323 P.2d 1003]: "Petitioner appears to have been guilty of a callous and brazen indifference to his obligations as an attorney, with 'the object of personal gain.' [Citation.] His vacillating conduct, his evasive testimony, and his lack of candor before the local committee were not compatible with the high degree of fidelity to his professional duties owed by an attorney at law. [Citation.] His actions . . . exhibit an intentional, flagrant violation of the rules . . . . In these circumstances, it is proper that he should be suspended from the practice of law for a substantial period of time."

---

[4]The six dissenting members of the board recommended that he be suspended for five years from the effective date of his interim suspension.

It is therefore ordered that petitioner, Alvin E. Honoroff, be disbarred from the practice of law in this state and that his name be stricken from the roll of attorneys. It is also ordered that he comply with rule 955 of the California Rules of Court and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective 30 days after the filing of this opinion.