[No. S004072. July 18, 1988.]

In re LEONARD DALE BASINGER on Disbarment.

**COUNSEL**

Allan H. Stokke and Gerard Engelskirchen for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., and Richard J. Zanassi for Respondent.

**OPINION**

**THE COURT.\***—We review written objections filed pursuant to rule 951(d), California Rules of Court, by petitioner Leonard Dale Basinger following the unanimous (12-0) recommendation of the Review Depart-

---

\*Before Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Arguelles, J., Eagleson, J., and Roth (Lester Wm.), J.†

†Presiding Justice, Court of Appeal, Second Appellate District, Division Two, assigned by the Chairperson of the Judicial Council.

ment of the State Bar Court that petitioner be disbarred. This recommendation followed petitioner's 1985 guilty plea to one count of grand theft in connection with his conversion of money from both his client trust account and the operating accounts of his law partners. Since the recommendation of the State Bar is entitled to great weight and petitioner's arguments do not persuade us he is entitled to leniency, we adopt the review department's recommendation.

FACTS

*The Criminal Proceedings*

Petitioner was admitted to practice in 1972. In 1977, he entered into a legal partnership with Bill Elliott and Michael Parr. Valynda Kiser, his legal secretary since late 1975, was hired as the partnership's secretary and office manager. In that capacity, Kiser handled the firm's accounts and was responsible for issuing checks on behalf of the partners.

Petitioner invested in the stock market in 1978-1979 and lost money. Kiser stated she could make money for him by investing his money in the commodities market. He agreed and opened a commodities trading account with Merrill Lynch, Pierce, Fenner & Smith (Merrill Lynch) in the summer of 1979. Although the account was in petitioner's name, he gave Kiser a general power of attorney to invest on his behalf and she handled the buying and selling for him. Petitioner testified that he had insufficient time to devote to investing his money in the commodities market and did not advise Kiser on how she should handle the account. He further testified that during this period, Kiser gave him general information about whether he gained or lost but did not give him a running total. He testified that she appeared to handle the account competently and did not indicate there were any problems.

In March 1980, Kiser told petitioner there was a problem with the account over a sugar trade and they would have to sue. However, she told him "not to worry about it. We were right and they were wrong." Petitioner testified that he later found out that Merrill Lynch closed his account and sued him for $120,000. After the Merrill Lynch account was closed, Kiser opened a trading account in her name with another firm although petitioner's name was added later to make it a joint account.

In January 1981, Parr informed petitioner that Kiser had transferred money from Parr's operating account to petitioner's operating account without permission, resulting in the bank dishonoring a check Parr had written. Petitioner stated he "can't imagine that kind of conduct," apolo-

gized to Parr, and said such activity would cease. When he questioned Kiser about the matter, she replied she had to transfer some money around and not to worry about it.

In February 1981, petitioner became aware of a problem with the settlement proceeds of Billie Hackett, a client. Petitioner testified Kiser told him that she had "borrowed" the Hackett money to cover losses in the commodities market but that the money would be replaced and there would be "no problem." Petitioner averred that he had no indication that this was a widespread problem and did not believe other problems existed. He borrowed $26,000 from a friend and used the money to cover the diverted funds in his client trust account. At the time, petitioner did not inform Parr or Elliott about the diversion of funds nor request an audit of the partnership's books.

By 1981, petitioner's marriage had come apart. He became romantically involved with Kiser and, in April 1981, they discussed living together. She then revealed that the Hackett matter was not an isolated incident and that she had been taking money from the client trust account and the accounts of the other partners to cover losses she incurred investing in the commodities market on his behalf. Petitioner then attempted to determine how much money was involved. He neither told his partners nor requested an audit, believing he could handle the problem without doing so.

By July 1981, Parr suspected irregularities and removed the partnership's financial records for an audit. (Bill Elliott had since left the partnership.) After discovering the improper transfers of money between accounts, Parr confronted petitioner and Kiser. Petitioner told Parr that Kiser was his responsibility and that he would make good on the losses. He borrowed money from his parents to cover some of the losses, initially telling them it was to pay his taxes. When he refused to borrow more money from his parents to cover additional losses, Parr reported the misconduct to the district attorney. Petitioner and Kiser were thereafter arrested and charged with grand theft.

At trial, petitioner did not deny the fact that Kiser made improper transfers of money between his client trust account and his own operating account to cover losses in the commodities market. However, he testified he had no agreement with Kiser authorizing such transfers and that he had no knowledge of the misconduct until after the fact. He further testified that he told Parr that although the money was placed in his operating account, he never personally used the money.

The prosecutor relied on circumstantial evidence to prove petitioner's criminal intent, arguing in his closing statement that it was unreasonable to

assume that Kiser worked entirely on her own and did not tell petitioner about the improper transfers until April 1981 when they were considering living together. He noted the evidence revealed petitioner knew of the improper withdrawal of $5,000 from Parr's account as early as January 1981 and the problem with Hackett's settlement proceeds a month later and yet did not examine the partnership's accounts or request an audit. There was evidence that settlement checks were used to open new joint bank accounts in petitioner's and Kiser's names and that in several cases, the signatures of clients were forged to enable the cashing of the settlement checks. There was evidence petitioner bet heavily on sporting events during this period and withdrew money from his client trust account to cover his losses. The prosecutor argued that it was unreasonable to assume that Kiser, who was romantically involved with petitioner at the time, did not reveal the scheme to petitioner during the critical months in late 1980 and early 1981.

The jury found petitioner guilty of one count of grand theft and sustained a great takings enhancement, finding the amount stolen was in excess of $100,000. (Pen. Code, §§ 487, subd. 1, 12022.6, subd. (b).) However, the conviction was reversed on appeal, the appellate court finding the jury instructions on aiding and abetting were inadequate. (See *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318].) On remand, petitioner pleaded guilty to a single count of grand theft, did not appeal, and his conviction is now final.

This court placed petitioner on interim suspension on January 19, 1983, following his criminal conviction. On August 15, 1985, we vacated the suspension order following the reversal on appeal. However, by order dated December 30, 1985, we again placed petitioner on interim suspension when he pleaded guilty on remand and thereafter referred the matter to the State Bar for hearing, report, and recommendation.

*The State Bar Disciplinary Proceedings*

Petitioner stipulated to his conviction and culpability at the outset of his hearing before the State Bar and the transcripts of his first trial were admitted as exhibits. The hearing thereafter consisted primarily of the presentation of character evidence. Several friends, attorneys, former clients, and one superior court judge testified to petitioner's good character, expressed the view that petitioner's misconduct was aberrational and was probably induced by the stress caused by his marital difficulties and the hectic pace of his law practice. Dr. David Albin treated petitioner in 1981-1982 and testified that petitioner was suffering from extreme emotional difficulty during the period in which the crime occurred and that his behavior was a reaction to "situational stress." He explained petitioner's gambling—both in the

commodities market and on sporting events—was a reaction to that stress and that petitioner's misconduct was very unlikely to recur since his life was now more stable and because he has since gained insights into his life. (By the time of the hearing, petitioner had divorced his wife, was married to Kiser, and had twins by her.) Finally, he stated that, in his opinion, petitioner was remorseful and could be trusted in the future.

Petitioner testified and expressly admitted he stole the money from his partnership and his client trust account. However, he maintained that as a result of his having served time in prison, undergone psychotherapy, and stabilized his home life by marrying Kiser, he had new insight into what happened and why. He averred that his newfound maturity and emotional well-being would prevent any future misconduct.

Michael Parr, petitioner's former law partner, testified in rebuttal. He noted petitioner did not undertake restitution until Parr discovered irregularities in the accounts. Although petitioner borrowed money to cover the known losses, Parr contended he would never know how much petitioner stole because some settlement checks were placed directly into petitioner's account, leaving no trace. He noted that when petitioner declared bankruptcy, he allowed repossession of the partnership's telephone system, resulting in Parr receiving a poor credit rating. When Parr questioned petitioner about the phone system, petitioner replied he was not obligated to repay Parr for that item. On cross-examination, however, Parr admitted petitioner signed over a note to him in order to settle a lawsuit Parr had filed against him, that he received $48,000 on the note, and that he signed a letter saying his acceptance of the note was in full restitution of all losses.

The decision of the hearing referee found petitioner's case was aggravated by his violation of his fiduciary relationships with his clients and partners, by the amount of money involved ($260,000, although only $160,000 was missing at any one time), and by his use of Kiser as an accomplice. However, the referee found the following mitigating factors: (1) "there does not appear to have been a direct intent to permanently deprive" the victims of their money, but to instead merely borrow the funds; (2) full reimbursement has been made and was being made prior to initiation of legal proceedings; (3) petitioner has not practiced law since February 1983; (4) he successfully completed the terms of his probation, including serving time in county jail;[1] (5) he has no prior record of discipline and the instant misconduct occurred during a limited period in his life; (6) petitioner appears truly remorseful; (7) petitioner sought psychiatric treatment for his problems; (8) the stressful

---

[1] Petitioner spent two months in custody following the jury's verdict in his first trial before posting bail on appeal. In addition, he spent six months in county jail as a condition of probation following his subsequent guilty plea.

aspects of his life during 1980-1981 no longer exist and petitioner "appears to have grown both emotionally and intellectually"; (9) petitioner's misconduct was caused "to a substantial degree" by situational stress.

Despite concluding that "this case is one of the most severe and clear cut breaches of professional responsibility that has been encountered" by the hearing referee, he nevertheless found the mitigating circumstances of petitioner's case were compelling. He stated it was his "firm and immutable belief . . . that a disbarment is *not* indicated or mandated in this matter and that such a sanction would be wrongful in itself." (Italics in original.) He concluded that petitioner has been "rehabilitated, has already been severely punished for his crimes, and is entitled to that same degree of forgiveness, understanding and compassion that we seek to instill in our children through the cultural and religious philosophies of our society." The referee concluded that petitioner should suffer a five-year suspension but should get credit for four years already served on interim suspension. In addition, the referee recommended the remaining year of petitioner's suspension should be stayed and petitioner placed on probation on conditions including continuing with his psychotherapy, abstaining from investing in the stock and commodities market as well as gambling for money, performance of 200 hours of community service, and passing the Professional Responsibility Examination.[2]

---

[2] The referee apparently felt quite strongly in this matter and his comments are deserving of reproduction: "It is the opinion of the Principal Referee having heard, read and reviewed all of the evidence in this case, that respondent is deserving of a second chance, and that this respondent can and will be a credit to his community and profession and should be afforded the opportunity to grow personally and professionally in association with the legal profession. The emphasis in this case, considering the metamorphosis of Respondent, the change of circumstances, remorse, and all other factors both in aggrevation [*sic*] and in mitigation, should be positive and evaluate not only the nature and extent of the offenses, but also where and who Respondent is at the present time and whether he is an asset worth saving. We know that what Mr. Basinger has done is a serious wrong. Was [were?] this a situation in which there had been prior instances of misconduct or discipline, or if Respondent existed alone in a vacuum, probably a second chance would not be indicated and the emphasis would be on punishment and not on rehabilitation. However, the fact remains that Respondent has spent [a] moderate time in jail. He has not practiced law for approximately *four and a half years*. He is remarried in a stable home life with two little boys who seem to have given him a sense of direction and responsibility that other circumstances alone could never provide. He has expressed his love for the legal profession and through the suspension and threatened loss of his license seems to have gained an appreciation of the significance, both on personal and financial levels, of what his license represents that is in all probability keener and more mundane than many of those within the profession who are secure within their positions and therefore take for granted without appreciation that which is a privilege rather than a right. Often times we must lose something before we can understand or appreciate its true value, and we must sometimes forget the significance of our profession to our underlying basic values and beliefs. Ask a trial lawyer when was the last time he/she thought in terms of justice rather than winning and losing.

Despite the referee's rather impassioned decision not to recommend disbarment or even any additional actual suspension, the review department declined to adopt the referee's findings in mitigation or his recommendation as to discipline. Instead, the department unanimously recommended petitioner be disbarred. In support of its decision, the department emphasized that it had examined the transcript of petitioner's jury trial and did not perceive the same amount of remorse and contrition found by the referee. Moreover, the department was troubled by the multiple thefts of over $260,000, petitioner's lies to clients to cover his thefts, and that restitution was made only after losses were discovered and the intervention of police threatened by Parr. Agreeing with the hearing referee that petitioner's underlying conduct was "clear and egregious," the department reasoned that the hearing referee's proposed discipline "would be woefully inadequate in the light of the magnitude of Respondent's thefts" since it in effect represents only an additional year of monitored probation. Accepting the referee's observation that petitioner had been truly rehabilitated, the review department averred that a more proper forum for such evidence would be a proceeding for reinstatement.

---

"We further point out that the legal aphorisms of 'a speedy and public trial' and 'Justice delayed is not justice' may not have legal significance in this type of administrative disciplinary proceeding, but in a very real sense the lapse of time from the acts to the conviction, and from the conviction to the administrative determination, renders the significance in human terms and disciplinary [terms] meaningless. . . . [I]t will be more than EIGHT YEARS after the underlying offenses occurred before the final scene in the final act is played out and a final determination rendered. Time passes and people change. Although we firmly believe that Respondent has grown from his ordeal and that the legal community can and will benefit from his experiences, the real point is that EIGHT YEARS is a long time. None of us is the same person he was eight years ago, and if time is a great healer, and if we actually believe in the concept of forgiveness, that people can learn and grow from their mistakes, and that we do not give up on human beings, rather than paying only hypocritical lip-service to these ideals, then we must out of duty to ourselves as well as to others in our society give the benefit of the doubt to Respondent, afford him a second chance, and allow him to function to his fullest capacity as a professional, husband, father and productive member of society. Eight years is a long time. So is four and a half.

"This is not to say that the general public with whose protection and welfare we are charged should be left bare, unprotected and unsuspecting at the mercy of Respondent. Forgiveness and rehabilitation are not mutually exclusive with [from?] the necessity to safeguard and protect society, recognizing the fact that there are recidivists, and that until Respondent proves himself by his acts rather than by his words alone, he remains suspect and should exist to the extent necessary subject to the scrutiny, examination and supervision of those to whom he may pose a threat and their designated administrative representatives. These safeguards are already in place and can be implemented at a far less cost in time, money and personal effort than the cost of writing off Respondent and permanently labelling him as pariah and thief. The Respondent is 43 years old. He still has many years he could give back to this profession." (Italics and capitalization in original.)

## DISCUSSION

■ We begin with the oft-cited proposition that although the State Bar's recommendation is entitled to great weight, this court must exercise its independent judgment to determine whether the facts and circumstances of petitioner's case justify the discipline recommended. (*In re Ford* (1988) 44 Cal.3d 810, 815 [244 Cal.Rptr. 476, 749 P.2d 1331]; *In re Vaughn* (1985) 38 Cal.3d 614, 618 [213 Cal.Rptr. 583, 698 P.2d 651].) "The burden is on petitioner to show that the recommendation is erroneous or unlawful. [Citation.]" (*Vaughn, supra,* at p. 618.) " 'In meeting this burden, the petitioner must demonstrate that the charges of unprofessional conduct are not sustained by convincing proof and to a reasonable certainty.' (*Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 794 [94 Cal.Rptr. 825, 484 P.2d 993].)" (*Kapelus* v. *State Bar* (1987) 44 Cal.3d 179, 184 [242 Cal.Rptr. 196, 745 P.2d 917].)

■ In addition, petitioner's criminal conviction of grand theft is conclusive evidence of his guilt (Bus. & Prof. Code, § 6101, subd. (a); *Ford, supra,* 44 Cal.3d at p. 815), and that crime necessarily involves moral turpitude. (*In re Honoroff* (1975) 15 Cal.3d 755, 760 [126 Cal.Rptr. 229, 543 P.2d 597].) ■ It has long been the rule that misappropriation of client trust funds is a most serious offense by an attorney and generally warrants disbarment absent the existence of compelling mitigating circumstances. (*Ford, supra,* at p. 816; *Vaughn, supra,* 38 Cal.3d at pp. 618-619.) Indeed, a recent amendment to Business and Professions Code section 6102, effective January 1, 1986, authorizes summary disbarment for such an offense irrespective of any mitigating circumstances. (See Stats. 1985, ch. 453, § 15, pp. 1753-1754; see also *Ford, supra,* at p. 816, fn. 6 [discussing the amendment].)[3]

Petitioner commences his argument by claiming the review department's rejection of the hearing referee's conclusions and recommendation as to discipline was erroneous in a number of respects and contrary to the evidence presented to the hearing referee. ■ We consider his contentions seriatim, keeping in mind that, at least as to questions of appropriate discipline, the review department's recommendations are entitled to greater weight than that of the hearing referee. (*Davis* v. *State Bar* (1983) 33 Cal.3d 231, 240 [188 Cal.Rptr. 441, 655 P.2d 1276]; *Garlow* v. *State Bar* (1982) 30 Cal.3d 912, 916 [180 Cal.Rptr. 831, 640 P.2d 1106].)

Petitioner first argues the review department erred by relying on the transcript of his jury trial to find he lacked the degree of remorse and

---

[3] Although the State Bar argues we should apply the amended statute to this case, it did not rely on that theory in the hearing below. Moreover, we need not address that issue because, as in *Ford, supra,* 44 Cal.3d at p. 816, fn. 6, "the same result obtains even if his mitigating evidence is considered."

contrition found by the hearing referee. Petitioner submits that remorse was not at issue in his criminal trial and "it would have been improper to offer evidence of remorse at that proceeding." However, petitioner testified at his trial and expressly disavowed any knowledge of the thefts until after the fact, instead laying the blame at Kiser's feet. By concluding "the trial record does not disclose the same level of purported acceptance of responsibility, contrition or remorse for his misconduct as Respondent asked the hearing referee to find," it appears the review department was referring to the inconsistency between petitioner's trial testimony (where he denied his guilt) and his disciplinary hearing testimony (where he admitted his guilt and exhibited remorse before the hearing referee). The review department's conclusion does not, as implied by petitioner, mean it wholly disbelieved the evidence of remorse presented to the hearing referee but only that, when considered in conjunction with the record of petitioner's trial, it did not find the evidence of remorse as compelling as did the hearing referee. We agree.

Petitioner next contends the record reveals the review department decided that his misconduct warrants disbarment *regardless* of his mitigating evidence. This was erroneous, he argues, because disbarment is not mandatory in this situation and mitigating circumstances are relevant to determining the appropriate discipline. However, the review department's decision clearly states that it "carefully considered the matters offered in mitigation," including "not only the hearing referee's findings and 'Discussion' of the thoughts underlying his ultimate recommendation, but also the 13 volume transcript of the criminal trial held before entry of Respondent's subsequent plea." Accordingly, we find no indication the review department arrived at its recommendation without considering petitioner's mitigating evidence.

Petitioner next challenges the review department's conclusion that the degree of discipline recommended by the hearing referee was inadequate to protect the public. He argues the department did not point to any evidence showing he was a continuing danger to society and maintains that no such evidence is present in the record. Although admittedly petitioner's many character witnesses, including Dr. Albin, opined that petitioner was no longer a danger to society and should thus be permitted to resume the practice of law, petitioner overlooks contrary evidence present in the record. For example, Michael Parr testified he would not trust petitioner again and we note his observations of petitioner during this period may be entitled to greater weight since he worked in close proximity to petitioner during the time the crimes were committed. (Some favorable witnesses admitted they had not seen petitioner in many years.) Also, when sentencing petitioner following his jury trial, the trial judge announced in no uncertain terms that he remained unconvinced that petitioner was truly rehabilitated or that

future crimes would not occur. Thus, there was at least some evidence showing petitioner was a continuing danger to society.

Although there is admittedly much evidence showing petitioner has progressed to such a point that his reaction to stress in his life will not manifest itself in a similar manner, the public's protection is not the sole point of inquiry. We must still consider the enormity of the crime and its effect on the integrity, high professional standards, and public confidence in the legal profession. (*Garlow, supra,* 30 Cal.3d at p. 917; see also Rules Proc. of State Bar, div. V, Standards for Atty. Sanctions for Prof. Misconduct, std. 1.3 ["The primary purposes of disciplinary proceedings . . . are the protection of the public, the courts and the legal profession; the maintenance of high professional standards by attorneys and the preservation of public confidence in the legal profession."].)

Petitioner engaged in an ongoing operation of diverting trust and partnership funds to his own use, thereby breaching his most basic fiduciary obligations to his clients and partners. He worked with an accomplice and we may infer from the evidence that the scheme would have continued indefinitely since it only ceased when Parr discovered petitioner's defalcations. An unusually large amount of money was involved. Signatures on checks were forged and cases settled, possibly compromising his clients' rights. It is obvious that the seriousness of the offense weighs heavily in favor of disbarment.

This case bears some factual resemblance to *In re Distefano* (1975) 13 Cal.3d 476 [119 Cal.Rptr. 105, 531 P.2d 417]. In that case, an attorney found himself heavily in debt due to his inability to refuse a friend's requests for money and other material aid. After the attorney's conviction for filing several false tax returns in connection with a scheme to defraud the federal government, several witnesses appeared before the State Bar and attested to the attorney's good character, reputation for honesty, and legal skill. The attorney expressed repentance and a letter from a psychiatrist averred that the attorney was well on his way to emotional good health. In ordering the attorney disbarred, this court explained that despite these expressions of rehabilitation, "the misconduct was of an aggravated nature involving successive deliberate fraudulent acts, including forgery, extending over a substantial period (1971-72). He manifestly was not qualified by character to be a member of the Bar at the time of the misconduct." (*Id.* at p. 481.)

Thus, even assuming arguendo that there is substantial evidence showing the public would stand in no danger should we permit petitioner to resume the practice of law, we conclude the review department's recommendation of disbarment is supported by the seriousness of the crime and its impact on

both the integrity and high standards of the legal profession, as well as on the public confidence in the profession.

Petitioner next alleges the review department misapprehends the degree of public protection afforded by the discipline recommended by the hearing referee. The referee recommended a five-year suspension but directed petitioner be given credit for the four years he had already served on interim suspension. In finding that discipline inadequate, the review department emphasized that the practical effect of the referee's decision was to impose only an additional one-year probation for petitioner's misconduct. Petitioner argues this characterization ignores the more than five years he has now already endured on suspension pursuant to the two orders placing him on interim suspension and further claims he is entitled to "credit" for this time as a matter of fundamental fairness.

We may reject this latter argument at the threshold. ■ While the amount of time an attorney has spent on interim suspension is a factor worthy of consideration (see *In re Dedman* (1976) 17 Cal.3d 229 [130 Cal.Rptr. 504, 550 P.2d 1040] [where this court considered but ultimately declined granting such credit]), this court must determine the appropriate discipline in light of all the relevant evidence. To hold an attorney is entitled, as a matter of fundamental fairness, to credit for time spent on interim suspension ignores the reality that such suspension was not imposed to punish petitioner but to protect the public against possible future defalcations by a member of the bar convicted of a crime involving moral turpitude.[4] In addition, we note petitioner does not allege the delay in holding a disciplinary proceeding prejudiced him in the legal sense. (See *Ford, supra,* 44 Cal.3d at pp. 818-819.)

In any case, we agree with the review department that a probationary period of only one year is insufficient. Even assuming this court were disinclined to order disbarment, the seriousness of the offense would require a long probationary period on conditions including a period of actual suspension as well as the standard condition that his client trust account be overseen by a certified public accountant. Petitioner's ability to demonstrate proper handling of his client trust account over just 12 months is manifestly inadequate to demonstrate his rehabilitation when we consider the magnitude of this crime. Moreover, any new suspension we might impose when

---

[4] We note that the new Rules of Procedure of the State Bar, division V, Standards for Attorney Sanctions for Professional Misconduct, standard 3.2, states that in cases involving a conviction for a crime involving moral turpitude, and where suspension rather than disbarment is imposed, "the discipline shall not be less than a two-year actual suspension, *prospective to any interim suspension imposed,* irrespective of mitigating circumstances." (Italics added.)

added to the five years petitioner has already been suspended, would result in quite a long period of actual suspension and demonstrates the review department properly questioned whether petitioner would be prepared to practice law after serving so long a suspension.

■ In short, we agree with the review department's opinion that "the better forum for presentation of information on Respondent's rehabilitation is in reinstatement proceedings after disbarment. Therein, focus will be on rehabilitation directly and on associated issues of respondent's present fitness to practice law, which has not been addressed in these proceedings (See, e.g., *In re Nevill* (1985) 39 Cal.3d 729, 738 [217 Cal.Rptr. 841, 704 P.2d 1332])." As we stated in *In re Petty* (1981) 29 Cal.3d 356 [173 Cal.Rptr. 461, 627 P.2d 191], "evidence of any rehabilitation will be more persuasive if offered during any reinstatement proceedings after disbarment. At that time petitioners may be able to show by sustained exemplary conduct over an extended period of time that they have reattained the standard of fitness to practice law. [Citations.] This has been our usual disposition in similar cases involving a comparable pattern of theft and forgery by a member of the bar. [Citations.]" (*Id.* at p. 362.)

Petitioner complains this reasoning places him in a "Catch-22" situation since we decline to credit him for the long period he has been suspended but do not "hesitate" to use the lengthy suspension "against him" by suggesting it has eroded his legal skills. This argument suggests that our decision is unfair to petitioner because he "loses" whichever decision he makes. ■ By so arguing, he reveals a basic misunderstanding of attorney discipline, namely that it "is not punitive but to inquire into the fitness of the attorney to continue in that capacity for the protection of the public, the courts, and the legal profession. [Citations.]" (*Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 748 [111 Cal.Rptr. 905, 518 P.2d 337].) Thus, our conclusion that disbarment is appropriate is based on our assessment of the entire record and keeping in mind our duty to protect the public. Would petitioner insist that we return him to practice despite the review department's well-founded fears that the long period of inactivity may have diminished his legal skills? To ask the question is to provide the answer. We thus perceive no unfairness to petitioner by both declining to grant him credit and concluding that his long suspension may have eroded his legal skills. As the review department explained, petitioner may demonstrate his rehabilitation and whether in fact the long suspension has caused any deterioration of his legal skills in future reinstatement proceedings.

Petitioner next argues that the question of his rehabilitation is not the sole province of reinstatement proceedings but that such evidence is also relevant to determining the appropriate degree of discipline. We agree.

Nevertheless, substantial evidence supports the review department's recommendation to disbar petitioner, even taking into account the evidence of petitioner's rehabilitation and the hearing referee's eloquent affirmation that petitioner deserves a second chance.

Petitioner lastly contends the review department failed to consider his exemplary record and lack of prior discipline, noting the department failed to mention these circumstances in its decision. On the contrary, while the review department did not explicitly mention these factors, it stated it had "carefully considered" the conclusions of the hearing referee as well as "the matters offered in mitigation."

Moreover, in undertaking our independent examination of the record, we conclude petitioner has failed to carry his burden of demonstrating the review department's recommendation as to discipline is erroneous. We admit the record contains much evidence attesting to petitioner's past effectiveness as an attorney, the psychological roots of his misconduct, low probability of the misconduct recurring, and his rehabilitation. In addition, we are cognizant of the absence of prior misconduct.

Nevertheless, we find the mitigating evidence is not as persuasive as petitioner suggests. Indeed, we disagree with petitioner's characterization of the record on several key points. First, he incorrectly asserts that there are no facts in the record which reveal "any basic dishonesty or character flaw which would dictate disbarment." ■ By so stating, he overlooks his plea of guilty to grand theft, which is conclusive evidence of his guilt of a crime involving an intent to steal. (Bus. & Prof. Code, § 6101, subd. (a); *People* v. *Campbell* (1976) 63 Cal.App.3d 599, 615 [133 Cal.Rptr. 815] [grand theft involves intent to steal].)

Second, we cannot accept his argument that his crime "*was more akin to borrowing* than to taking with intent to *permanently* deprive." (Italics in original.) His guilty plea necessarily admits every element of the crime of grand theft, including the intent to steal. (*Campbell, supra,* 63 Cal.App.3d at p. 615.) ■ Moreover, petitioner's contention that embezzlement does not require an intent to permanently deprive the true owner of his or her property, while true, does not mitigate this case. Embezzlement requires conversion of trusted funds coupled with the intent to defraud. (*People* v. *Kronmeyer* (1987) 189 Cal.App.3d 314, 361 [234 Cal.Rptr. 442]; 18 Cal.Jur.3d (rev.) Criminal Law, § 1155, p. 187.) An intent to deprive the rightful owner of possession even temporarily is sufficient and it is no defense that the perpetrator intended to restore the property nor that the property was never "applied to the embezzler's personal use or benefit." (18

Cal.Jur.3d, *supra,* at p. 187; 1 Witkin, Cal. Crimes (1963) § 391, p. 364.) Such criminal intent cannot fairly be characterized as a mitigating factor.

Third, that petitioner "repaid" many of his victims before his wrongful acts were discovered does not weigh in his favor since the evidence shows he merely converted funds from new sources, i.e. new victims, to cover past misconduct. Moreover, as stated above, an intent to restore stolen money is not a defense.

Fourth, contrary to his claim that no victim suffered permanent injury, Parr testified that he cannot be sure that all victims have been repaid since some settlement checks were deposited directly into petitioner's account, leaving no trace. Moreover, Parr testified that he has been unable to obtain financing due to the poor credit rating he received when petitioner permitted repossession of the partnership's telephone system.

Fifth, although restitution came at an early stage in the proceedings, the record reveals that restitution was made only after Parr discovered the crime and threatened police intervention. Restitution under such circumstances is entitled to little weight. (*Ford, supra,* 44 Cal.3d at p. 817; *Fitzpatrick* v. *State Bar* (1977) 20 Cal.3d 73, 88 [141 Cal.Rptr. 169, 569 P.2d 763].)

We thus conclude that, on balance, the review department's recommendation is supported by substantial evidence and petitioner fails to persuade that the department's decision is erroneous or unlawful.

### Disposition

It is ordered that petitioner Leonard Dale Basinger be disbarred from the practice of law and that his name be stricken from the roll of attorneys in this state. This order is effective upon finality of the decision.