[No. S011975. Dec. 31, 1990.]

JOSEPH EDWARD PORTER III, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

David A. Elden for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., Starr Babcock and Gail Andler for Respondent.

OPINION

**THE COURT.**—We review the recommendation of the Review Department of the State Bar Court (review department) that petitioner, Joseph Edward Porter III, be suspended from the practice of law for a period of five years upon certain conditions of probation, including actual suspension for two and one-half years and until he demonstrates his competence pursuant to standard 1.4(c)(ii) of the Standards for Attorney Sanctions for Professional Misconduct (div. V of the Rules Proc. of State Bar and hereafter referred to as standards). After considering the record and the arguments of petitioner and the State Bar, we conclude that the recommended discipline should be largely adopted, but that the length of the actual suspension should be two years.

### FACTS

Petitioner was admitted to the practice of law in California on January 5, 1972. In 1984 petitioner was suspended from the practice of law after failing to pay his State Bar dues, and was reinstated upon payment of those dues in September 1986. In the present proceeding, the hearing panel of the State Bar Court (hearing panel) found misconduct in the following matters:

#### The Harper Matter

In early 1981, petitioner was retained to represent Harper in the collection of a debt on a contract that provided for arbitration. The parties agreed

that the legal fee was to consist of a $1,500 payment by Harper and an additional contingency fee to be paid from the amount collected. The action was filed and on February 25, 1982, the court ordered the matter to arbitration. Petitioner took no further action on the matter, although Harper had paid petitioner $150 in 1982 and the $1,500 fee in September 1983. After September 1983, petitioner ceased communicating with Harper. Harper visited petitioner's office and was told by the building manager that petitioner had moved. In fact, petitioner had left his home address as a forwarding address. Petitioner, however, was later evicted from his home and he left without leaving a forwarding address.

### The Cooper Matter

In February 1983, petitioner borrowed $10,000 from his father-in-law, Cooper, who was not a client. In June 1983, petitioner issued a check to his father-in-law for $2,500 drawn on his client trust account, promising to pay the $7,500 balance by October 1983. The check was returned twice by the bank for insufficient funds.[1]

### The Lewis Matter

In June 1983, Lewis retained petitioner on a contingency basis to represent her in a personal injury matter. In November 1983, Lewis discharged petitioner and asked for the return of her file. Petitioner failed to return the file and thereafter took no action in the case.

### The Jones Matter

In January 1982, petitioner was hired by Jones to represent him in a dissolution of marriage proceeding. Jones paid petitioner $550 in cash, representing $122 in advance for costs and $428 in full payment of attorney fees. In January 1982, petitioner's secretary negligently prepared papers which indicated a dissolution action had been prepared and filed. In fact, no such papers were filed. Jones telephoned petitioner weekly after August 1983, but petitioner did not answer his phone. Jones went to petitioner's office and learned from the building manager that petitioner no longer had an office there. The building manager did not give Jones petitioner's home address or any other forwarding address. Petitioner returned neither the $122 advanced as costs nor the $428 in unearned fees.

---

[1] We note that petitioner's misconduct in this matter lay in his attempt to pay a personal loan out of his clients' trust account. Whether Mr. Cooper's loan is now outstanding is disputed by petitioner and is a matter properly resolved in a civil action.

### The Tappan Matter

In November 1984, petitioner was retained by Tappan to represent Tappan in a partnership matter. Tappan gave petitioner $500 as advanced fees together with certain documents. In March 1985, Tappan hired a new attorney and sought return of the documents from petitioner. Petitioner did not return the phone calls and failed to respond to certified letters and a telegram. He did not refund the $500.

### The Stephenson Matter

In January 1983, Stephenson retained petitioner on a contingency fee basis to represent her in a personal injury matter. Petitioner failed to file an action and failed to perform legal services. In April 1984, Stephenson tried to contact petitioner without success. She left telephone messages with petitioner's secretary, but petitioner failed to return the calls. In May and June 1984, new counsel for Stephenson wrote to petitioner, but received no reply. Petitioner failed to deliver the file to new counsel. The statute of limitations on the case ultimately expired.

### The Koltun Matter

In November 1982, Koltun retained petitioner to represent him in a pending superior court action. In April, June and August 1983, petitioner received requests for admissions from counsel for the adverse party. He never answered them and a default judgment was ultimately entered against Koltun. In June 1983 petitioner informed Koltun that the first requests for admission were not deemed admitted (by failure to respond). He led Koltun to believe that "everything is being taken care of." Petitioner made no motion for relief from default under Code of Civil Procedure section 473. In November 1983, Koltun requested that petitioner sign a substitution of attorney form, which petitioner refused to sign, unless it was backdated to September 1, 1983, so as to limit petitioner's liability for malpractice for failure to answer the requests for admission or to seek relief under Code of Civil Procedure section 473. Thereafter, the superior court ruled that petitioner had not abandoned Koltun and refused to set aside the judgment entered against Koltun.

### Practicing Law While Suspended

From July 9, 1984, to September 15, 1986, petitioner was suspended from the practice of law for failure to pay State Bar membership dues. Petitioner contended that he was unaware of this suspension until September 1986, when he paid his back dues and was reinstated. However, during this period

petitioner practiced law, including his representations of 188 criminal law defendants under appointment by the Inglewood Municipal Court. Further, while suspended, petitioner declared under penalty of perjury in each of the 188 criminal matters that he was duly licensed to practice law.

### The Williams Matter

In June 1981, petitioner was retained on a contingency fee basis by Williams to represent her minor son in a personal injury matter. In February 1984, petitioner settled the case for $5,000 without the knowledge or consent of Williams or of the court. He forged the client's name to a release, falsely witnessed her signature, forged her endorsement on the settlement check, and kept the money.

### The Pouncey Matter

In February 1983, Pouncey hired petitioner to represent him in a personal injury case. In August, petitioner, with his client's consent, settled the case for $10,250 and Pouncey executed a release. Though he was entitled to only one-third of the amount as his fee, petitioner deposited the draft for $10,250 in an account other than a client trust account. An additional draft for $6,500 for costs was cashed by petitioner and put to his own use. A third draft for $3,071 to further reimburse costs was deposited in petitioner's trust account and put to petitioner's own use. In August 1983, petitioner informed Pouncey that petitioner could not then pay Pouncey the $6,500 or the $3,071 because all of the funds had to be paid at one time.

### Stipulations

Petitioner and the State Bar stipulated that culpability was conclusively established in that petitioner violated his oath and duties as an attorney within the meaning of section 6103 of the Business and Professions Code.[2]

---

[2] Section 6103 provides:

"A wilful disobedience or violation of an order of the court requiring [an attorney] to do or forbear an act connected with or in the course of his profession, which he ought in good faith to do or forbear, and any violation of the oath taken by him, or of his duties as such attorney, constitute causes for disbarment or suspension."

We have held that " 'since [section 6103] does not define a duty or obligation of an attorney, but provides only that violation of his oath or duties defined elsewhere is a ground for discipline, [the petitioner in that case] did not violate this section.' " (*Baca* v. *State Bar, ante,* p. 294 [276 Cal.Rptr. 169, 801 P.2d 412]; see also *Baker* v. *State Bar* (1989) 49 Cal.3d 804, 815 [263 Cal.Rptr. 798, 781 P.2d 1344].) Because the parties stipulated to this violation, we do not question whether section 6103 is applicable in this instance. However, we note that the discipline that we impose is not predicated upon this stipulation.

All code references are to the Business and Professions Code unless otherwise indicated.

The parties stipulated further that petitioner violated former rules 2-111(A)(2), 3-101(B), 6-101(A)(2), 8-101(A)(2), 8-101(B)(1), 8-101(B)(2) and 8-101(B)(4) of the Rules of Professional Conduct.[3]

Neither the stipulation nor the findings of the hearing panel specify which specific rule of professional conduct was violated by the conduct in any particular matter. The State Bar, however, asserts the following: former rule 2-111(A)(2) (failure to protect client when withdrawing from employment) was violated in the Harper, Lewis, Jones, Williams, Stephenson and Koltun matters; former rule 3-101(B) (unlawfully practicing law) was violated when petitioner practiced law in 188 criminal matters while suspended from the practice of law; former rule 6-101(A)(2) (failure to act competently) was violated in the Harper, Lewis, Jones, Tappan, Stephenson, and Koltun matters; and former rule 8-101(B)(4) (failure to promptly pay a client moneys due him) was violated in the Williams and Pouncey matters.

In addition, the parties stipulated that petitioner was guilty of multiple acts of moral turpitude and dishonesty within the meaning of section 6106, including the Cooper matter (writing a bad check on his trust account to pay a personal debt), the Jones matter (misappropriation of costs advanced), the Koltun matter (lying to a client), the Williams matter (forgery, false witness and misappropriation) and the Pouncey matter (misappropriation and lying to a client).

### Petitioner's Case in Mitigation

The two-day hearing before the hearing panel was devoted solely to petitioner's presentation of evidence in mitigation. There was evidence of petitioner's upbringing as the child of alcoholic parents and the development of rigid, achievement-oriented traits to compensate for the volatility of his home environment. He achieved distinction in several organizations and was a well-respected member of his professional and social community. The record reflects petitioner's exemplary history of community involvement and participation: he served as the vice-president of the Human Relations Commission of the City of Los Angeles, acted as fundraiser of the "Neighbor of Watts" (an organization that provides lunches and dinners for children in southeast Los Angeles), helped found the Black Entertainment Lawyer Association, aided in organizing and maintaining a scholarship program for 40 minority and foreign students each year, and apparently

---

[3] New Rules of Professional Conduct became operative on May 27, 1989; all references to rules refer to the former Rules of Professional Conduct of the State Bar of California.

joined others to form the Black American Law Student Association. In 1980 petitioner married, and in 1982 he and his wife had a daughter.

Soon after petitioner's daughter was born, petitioner experienced financial troubles which were rapidly eclipsed by marital discord. In 1983, petitioner and his wife divorced. The marriage dissolution was an unusually acrimonious one. The State Bar described this period: "In July, 1983 [petitioner's] bank account was overdrawn. He received a $15,000 bill from Saks, [and] a $10,000 bill from Neiman-Marcus that his wife had incurred. She was supposed to pay the household bills from money he put into her checking account. He learned the bills had not been paid for three months. Artwork, [clients'] files, her personal jewelry and all their wedding presents disappeared from the house. This was from May to July 1983. He had owned the house for ten years prior to marriage [in 1980]. When he tried to refinance it in 1983 to keep things afloat, his wife's signature was required. She refused to sign and he ultimately lost the house. He had a house in Carmel. His wife refused to cooperate and he lost that house through foreclosure. He also lost a house he had bought for his parents. In July 1983, he was ordered out of the house (by the Dissolution Court). When he moved back in, the house was a wreck."[4]

In addition, the State Bar's brief notes that petitioner was evicted from his law office in September 1983, and that he practiced out of his "wrecked" home until April 1985, when he was again evicted through foreclosure proceedings. In his responsive brief, petitioner argues that "the extent of these [marital] problems was not adequately conveyed [by respondent State Bar]. Respondent failed to acknowledge that petitioner's infant child was taken from him by his ex-wife. Respondent failed to adequately consider the harassing tactics petitioner's ex-wife utilized, such as causing petitioner to be falsely arrested, stealing his legal files, and causing him to lose all his property." Further, petitioner suggests that such events continued through "the beginning of 1984."

The events during this period of time evidently took a significant toll on petitioner. One witness described him during this time as "marginally functioning and extremely fragile emotionally," a second had observed his "inability to function," and yet another noted that "his ability to concentrate seemed limited." When asked by the referee in the proceedings of the hearing panel, "Would you say that the depression and/or anxiety were

---

[4]Petitioner graphically described the house as he found it upon his return: "Food was strewn all over the kitchen. 'Kill Porter. You are going to die' was written on the walls in nail polish.The water to an upstairs hot tub had been left running causing extensive water damage."

disabling to Mr. Porter in 1983?," petitioner's psychoanalyst answered: "Definitely, yes." However, after significant treatment in 1987, the psychoanalyst offered a positive prognosis for petitioner: "I don't think he will ever deteriorate as he did before."

In supplemental briefing, petitioner offered the declaration of his psychoanalyst, dated November 15, 1990, in which the doctor noted his "professional opinion that Petitioner had recovered from his dysfunctional period and was completely [r]ehabilitated [¶] . . . there are not psychiatric contraindications of Petitioner's continuing to practice his profession." Petitioner points out, as the State Bar acknowledged in oral argument, that his participation in community activities has resumed: he has continued his work for the scholarship fund for Los Angeles high school students, was recently elected to the board of directors of the Legal Aid Society of Orange County, has served over 45 hours this year as judge pro tempore for the Compton Municipal Court, and is involved in organizing programs for the Continuing Education of the Bar. Petitioner also draws our attention to personal and social achievements that, he argues, further establish his mental and emotional stability.[5]

*The State Bar Proceedings*

The hearing panel originally recommended five years' suspension, stayed, on condition of probation that included two and one-half years' actual suspension. Both the State Bar trial examiner and petitioner sought reconsideration and on August 25, 1988, the hearing panel filed an amended decision recommending disbarment.

The review department adopted the hearing panel's findings of fact without change. In light of petitioner's evidence in mitigation, the review department recommended by a vote of nine to four that petitioner be suspended for a period of five years, with actual suspension of two and one-half years.

DISCUSSION

The nine-member majority of the review department concluded that there was compelling mitigation and that the public would be adequately protected with a suspension, rather than disbarment, and the requirement

---

[5] These include his election as Grand Knight of the Knights of Columbus (a Catholic men's charitable organization) and his successful completion of the Los Angeles Marathon in under four hours.

for a showing of rehabilitation pursuant to standard 1.4(c)(ii), prior to petitioner's return to the practice of law. ■■■ Petitioner asserts that in light of the mitigating circumstances, the two-and-one-half-year actual suspension recommended by the review department is excessive.

■■ Our principal concern in State Bar disciplinary proceedings is always the protection of the public, the preservation of confidence in the legal profession, and the maintenance of the highest possible professional standards for attorneys. (*Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 132 [202 Cal.Rptr. 349, 680 P.2d 82].) In evaluating petitioner's claim, we exercise our independent judgment in determining the appropriate discipline to be imposed. (*Greenbaum* v. *State Bar* (1987) 43 Cal.3d 543, 550 [237 Cal.Rptr. 168, 736 P.2d 754].) However, we accord the findings and recommendations of the State Bar great weight in determining attorney disciplinary sanctions. (*In re Basinger* (1988) 45 Cal.3d 1348, 1358 [249 Cal.Rptr. 110, 756 P.2d 833].) It is petitioner's burden to establish that the review department's recommendations are in error. (*In re Ford* (1988) 44 Cal.3d 810, 816 [244 Cal.Rptr. 476, 749 P.2d 1331].) ■■■ In this case, we hold that petitioner has met his burden.

It is established that extreme emotional difficulties are a mitigating factor where "expert testimony establishes [that the difficulties were] directly responsible for the misconduct; . . . provided that the member has established through clear and convincing evidence that he or she no longer suffers from such difficulties . . . ." (Std. 1.2(e)(iv); see also *In re Lamb* (1989) 49 Cal.3d 239, 246 [260 Cal.Rptr. 856, 776 P.2d 765].) Further, we have recognized that certain events may trigger "aberrational" conduct requiring less severe discipline than might otherwise be required. (See, e.g., *Friedman* v. *State Bar* (1990) 50 Cal.3d 235, 245 [266 Cal.Rptr. 632, 786 P.2d 359]; *Waysman* v. *State Bar* (1986) 41 Cal.3d 452, 457 [224 Cal.Rptr. 101, 714 P.2d 1239].)

In *In re Naney* (1990) 51 Cal.3d 186 [270 Cal.Rptr. 848, 793 P.2d 54], we evaluated an attorney's claim that financial and marital difficulties resulted in psychological disturbance and caused him to misappropriate clients' funds; in that case, we were not persuaded by the attorney's showing of mitigation. We first noted that his "severe emotional distress" was not shown to be "directly responsible for the conduct." Even if his disturbance had caused the misconduct, however, we noted: "A psychological disorder that has caused or contributed to misconduct is mitigating only if the attorney establishes rehabilitation; in other words, the attorney must show that he has so overcome or controlled the disorder that it is unlikely to cause further misconduct. [Citations.]" (*Id.* at p. 197.) In *Naney*, we reject-

ed the attorney's claim because of our concern that his "psychological problems [were] so serious that extended and intensive therapy [would be] necessary." (*Ibid.*)

In contrast to the circumstances in *Naney*, here we are persuaded that petitioner's misconduct was directly related to his emotional disturbance. It is undisputed that petitioner was subjected to stresses far in excess of those usually associated with a dissolution; further, the theft of his client files and subsequent evictions from his office and his home (from which he was practicing) made the maintenance of relations with his clients challenging. Virtually all of the violations occurred between 1983 and early 1984. Petitioner practiced while suspended after 1984, but claims not to have had actual knowledge of his suspension.[6] The Tappan matter occurred at roughly the same time in 1985 that petitioner was being evicted from his home. After the Tappan matter, the misconduct abated.

Further, it appears that petitioner has now recovered from his emotional difficulties. ■ We consider psychiatric evaluations where "successful therapeutic rehabilitation or a strong prognosis for future rehabilitation is established." (*Ballard* v. *State Bar* (1983) 35 Cal.3d 274, 289 [197 Cal.Rptr. 556, 673 P.2d 226].) Petitioner's psychoanalyst opined in his November 15, 1990, declaration that petitioner was "completely [r]ehabilitated," and that he no longer needed therapy or associated treatments. The psychoanalyst testified in 1987, before the hearing panel, that the changes in petitioner's life led the psychoanalyst to the conclusion that petitioner would never "deteriorate as he did before." ■ We further rely on evidence of petitioner's recent social, community and professional activities, which cumulatively bespeak petitioner's rehabilitation.

Though we are persuaded by petitioner's showing of mitigation, we are nonetheless constrained to observe our responsibility to preserve confidence in the legal profession and maintain the highest possible professional standards for attorneys. (See *Sands* v. *State Bar* (1989) 49 Cal.3d 919, 928 [264 Cal.Rptr. 354, 782 P.2d 595].) Petitioner stipulated to several counts of abandonment of clients and also concedes his failure to tell clients the truth. He admits the unauthorized practice of law over a substantial period of time and 188 false declarations filed under penalty of perjury while suspended from the bar. He attempted to pay a personal debt with a check from his

---

[6] Though petitioner stipulated that he "should have known" that he was suspended from the bar between 1984 and 1986, he denies actual knowledge of this fact: "this was a job usually performed by his secretary, . . . he had changed addresses and never actually received notice [of his suspension], and . . . as soon as he recognized his mistake he flew to San Francisco to pay the bill."

client trust account, which attempt failed only because the bank refused to honor the check. Petitioner made no attempt to make restitution to clients until 1987, several years after the transgressions occurred and long after petitioner became aware of the pending State Bar proceedings. Finally, petitioner's behavior in the Williams matter, involving both forgery and misappropriation, is particularly repugnant. Accordingly, substantial discipline remains appropriate.

The review department recommended in 1987 that petitioner suffer actual suspension of two and one-half years. We agree with petitioner that his case in mitigation is especially compelling; yet, the review department took petitioner's case in mitigation into account in its recommendation. We note, however, that three years have since elapsed, during which petitioner has provided uncontradicted and "convincing proof of subsequent rehabilitation." (See std. 1.2(e)(viii).) ▮ ▮▮▮▮ We are particularly heartened by his involvement in both the legal and nonlegal communities (e.g., his participation as a judge pro tempore and continued work with the scholarship fund for high school students), which we find to be "an extraordinary demonstration of good character."[7] (See std. 1.2(e)(vi).) **(1d)** In light of this evidence of rehabilitation and character, we find slightly lesser, though still substantial, discipline appropriate in this case.

## DISPOSITION

We order that Joseph Edward Porter III be suspended from the practice of law in the State of California for five years. Execution of the order is stayed and petitioner is placed on probation for five years on the condition that he be actually suspended for two years and that he comply with all of the conditions of probation adopted by the review department on May 30, 1989, except that condition of probation which would award restitution to Mr. Cooper for his loan to petitioner. (See, *ante*, at p. 521, fn. 1.)

We further order that petitioner take and pass the Professional Responsibility Examination prior to the expiration of his period of actual suspension,

---

[7] We infer, because of petitioner's participation in these and similar activities *prior* to any instances of misconduct and because of the degree of petitioner's involvement, that petitioner has followed his general inclination toward service to his respective communities. We note, however, that we do not accord great weight to actions or activities which are solely or even substantially directed toward preempting disciplinary sanctions for attorney misconduct. (See, e.g., *Blair* v. *State Bar* (1989) 49 Cal.3d 762, 778 [263 Cal.Rptr. 641, 781 P.2d 933] [restitution paid during pendency of State Bar's investigation not entitled to significant weight as a mitigating factor].)

and that petitioner comply with rule 955, California Rules of Court, and perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order.

This order is effective upon the finality of this decision in this court. (See Cal. Rules of Court, rule 953(a).)

Petitioner's application for a rehearing was denied January 28, 1991.