[No. S014190. Feb. 21, 1991.]

ANDREW B. KAPLAN, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Pansky & Markle and Ellen A. Pansky for Petitioner.

Diane C. Yu, Richard J. Zanassi, Margaret E. Fourt and Stephen J. Strauss for Respondent.

OPINION

**THE COURT.**—We review the recommendation of the Review Department of the State Bar Court (Review Department) that petitioner, Andrew B. Kaplan, be disbarred from the practice of law. After considering the record and the arguments of Kaplan and the State Bar, we conclude that the recommended discipline is appropriate.

## I. FACTS

Kaplan was admitted to the practice of law in California on December 20, 1973. On January 1, 1978, he joined the law firm of Pettit & Martin as an associate. He became a partner in 1981. Among his duties as partner, Kaplan monitored billing of and receipts from clients' accounts.

During the period between February and September 1985, Kaplan deposited 24 checks payable to Pettit & Martin into his personal bank account. The total value of these checks was approximately $29,000. Of the twenty-four, all but one were sent to Pettit & Martin directly; one check was drawn on a trust account for a client whose assets were being held in bankruptcy.

In September 1985, Kaplan was confronted by the managing partner of Pettit & Martin, and after repeatedly denying knowledge of the missing checks, Kaplan admitted that he had taken four checks. He claimed that they were needed to help pay for necessary medical treatment for his father. On October 5, 1985, Kaplan confessed to all the misappropriations and resigned from the firm. He later reimbursed Pettit & Martin, primarily through an offset to his capital account. Pettit & Martin decided not to press criminal charges and, apparently on the urging of Pettit & Martin, Kaplan reported his conduct to the State Bar.

Kaplan explained to an official with the State Bar that he had deposited approximately $10,000 of Pettit & Martin's funds into his personal account. He claimed he needed the funds to finance medical treatment for his mother-in-law. After telling the investigator that he had spent roughly $100,000 of his own funds on her treatment, Kaplan failed to produce records of these expenditures and finally confessed that he had made no such expenditures. A hearing panel of the State Bar Court found that Kaplan used the money not for his mother-in-law but to purchase gifts for his wife and "to maintain a standard of living beyond his means."

Kaplan joined the firm of Silver & Freedman shortly after he left Pettit & Martin. He did not explain the circumstances surrounding his resignation from Pettit & Martin. Representatives from Silver & Freedman wrote to the

State Bar on behalf of Kaplan, asserting that his conduct has been exemplary since he joined the firm.

Kaplan does not materially dispute the facts that were before the Review Department. Instead he focuses upon the factors that tend to mitigate his culpability. Kaplan notes that "he was suffering from severe emotional instability." The causes of this instability included his mother-in-law's terminal cancer, marital problems, certain problematic character traits arising from his father's long-standing and chronic illness, and the absence of a "support system." Kaplan was seeing a psychotherapist throughout this period. He testified to Kaplan's fragile mental and emotional state at the time of the misappropriations. Kaplan claims that these problems have been overcome, and his psychotherapist concurs, though the hearing panel found that Kaplan had not produced clear and convincing evidence that he no longer suffers from his emotional difficulties.

Kaplan also produced 16 character witnesses, most of whom were surprised to learn of Kaplan's misappropriations and considered the behavior anomalous. Kaplan also cites his cooperation with the State Bar once the investigation was under way as a mitigating circumstance.[1]

The hearing panel found that Kaplan had violated Business and Professions Code sections 6068, subdivision (a), 6103, and 6106, and found that his acts came within the scope of standard 2.3 of the Standards for Attorney Sanctions for Professional Misconduct (div. V of the Rules Proc. of State Bar; hereinafter referred to as the standards). The hearing panel also found the misappropriation of the check from the client trust fund a violation of former rule 8-101(A) of the Rules of Professional Conduct,[2] but found that it did not constitute an act of moral turpitude.[3] It recommended that Kaplan be suspended from the practice of law for four years with two years' actual suspension. The Review Department rejected the hearing panel's recommended discipline and recommended by a vote of 13 to 1 that Kaplan be disbarred: its reasons were "the numerous separate misappropriations,

---

[1] Kaplan urges that we find that he cooperated with the State Bar in spite of the misleading statements he made to State Bar investigators at the commencement of the investigation. He suggests that those initial misrepresentations to the State Bar were made upon the advice of his psychotherapist, who "advised him not to disclose anything that would make him feel worse about himself; to try to reestablish some degree of self-esteem; and make him see that he had some options."

[2] New Rules of Professional Conduct became operative on May 27, 1989.

[3] The hearing panel found an absence of moral turpitude with regard to this violation only because of the unique circumstances of this case. The money was earned from the client trust fund and would have been available to Pettit & Martin under normal circumstances. Because this was a bankruptcy matter, however, Kaplan did not realize that he could not withdraw the funds without prior court approval. Further, an experienced bankruptcy attorney had indicated to Kaplan that the funds were available for withdrawal.

violations of fiduciary duty to former partners and attempts to mislead the State Bar."

## II. DISCUSSION

Standard 2.3 provides guidance to us in this case.[4] The hearing panel found repeated "acts of intentional dishonesty and concealment, violating his oath as an attorney and constituting acts of moral turpitude." Kaplan does not contest the State Bar's findings of multiple violations and its characterization of these violations as acts of moral turpitude.

█ Though we reserve the final determination of whether the facts and circumstances of a particular case justify the recommended discipline, we accord the findings of the Review Department great weight. (*In re Basinger* (1988) 45 Cal.3d 1348, 1358 [249 Cal.Rptr. 110, 756 P.2d 833].) We have recognized that it is the petitioner's burden to show that the Review Department's recommendations are erroneous. (*In re Ford* (1988) 44 Cal.3d 810, 816 [244 Cal.Rptr. 476, 749 P.2d 1331]; *In re Vaughn* (1985) 38 Cal.3d 614, 618-619 [213 Cal.Rptr. 583, 698 P.2d 651].) Thus, with the Review Department's recommendation of disbarment in mind, we turn to Kaplan's argument.

█ Kaplan urges that his situation is "aberrational" and, in accordance with certain of our other decisions,[5] that we should reject the State Bar's disciplinary recommendation. We have acknowledged that the absence of a disciplinary record is in itself an important mitigating circumstance for a member of the bar who has been in practice for a substantial period of time (*Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 747 [111 Cal.Rptr. 905, 518 P.2d 337]), and we have recognized the existence of marital stress as a mitigating circumstance (*Friedman* v. *State Bar, supra*, 50 Cal.3d 235, 245). However, Kaplan's conduct was distinguishable from those cases in which we found conduct sufficiently aberrational to reject the Review Department's disciplinary recommendations: it was part of a purposeful design to defraud his partners. Thus, it was unlike the cases Kaplan cites in which a few isolated incidents, generally involving client neglect, formed the basis of

---

[4]That standard reads: "Culpability of a member of an act of moral turpitude, fraud, or *intentional dishonesty* toward a court, client or another person or of concealment of a material fact to a court, client or another person shall result in actual suspension or disbarment depending upon the extent to which the victim of the misconduct is harmed or misled and depending upon the magnitude of the act of misconduct and the degree to which it relates to the member's acts within the practice of law." (Italics added.)

[5]Kaplan notes three cases which discuss "aberrational" conduct: *Friedman* v. *State Bar* (1990) 50 Cal.3d 235 [266 Cal.Rptr. 632, 786 P.2d 359], *Chefsky* v. *State Bar* (1984) 36 Cal.3d 116 [202 Cal.Rptr. 349, 680 P.2d 82], and *Waysman* v. *State Bar* (1986) 41 Cal.3d 452 [224 Cal.Rptr. 101, 714 P.2d 1239].

the State Bar's charges. Further, there is no indication that, absent the action of Pettit & Martin's partners, Kaplan would have ceased his conduct at all.

Kaplan further argues that his conduct occurred under "the most extenuating circumstances." The mitigating circumstances Kaplan relies upon, principally marital stresses and his mother-in-law's terminal illness, were no doubt personally devastating, but do not exculpate Kaplan for the betrayal of his partners' trust. Though Kaplan cites four cases in which extenuating circumstances prevented us from disbarring the petitioner, in none of them were we persuaded to impose less than the discipline recommended by the State Bar; in fact, in two serious cases, *In re Mudge* (1982) 33 Cal.3d 152 [187 Cal.Rptr. 779, 654 P.2d 1307] and *Weller v. State Bar* (1989) 49 Cal.3d 670 [262 Cal.Rptr. 549, 779 P.2d 293], the discipline that we imposed was actually *greater* than that which the Review Department considered appropriate under the circumstances. Unlike *Mudge, supra,* 33 Cal.3d 152, *Porter v. State Bar* (1990) 52 Cal.3d 518 [276 Cal.Rptr. 384, 801 P.2d 1135], and *Amante v. State Bar* (1990) 50 Cal.3d 247 [266 Cal.Rptr. 648, 786 P.2d 375], in this case Kaplan was not under any financial pressure; Kaplan misappropriated this money for no apparent reason other than to buy his wife expensive gifts and maintain a standard of living beyond his means. Finally, unlike any of the cases Kaplan cites, Kaplan has not sufficiently demonstrated that his circumstances are now changed. (See, *post,* at pp. 1072-1073.)

*In re Abbott* (1977) 19 Cal.3d 249 [137 Cal.Rptr. 195, 561 P.2d 285] is a case which is factually similar to the case before us. Prior to the incident which brought him to the attention of the State Bar, Abbott had had no disciplinary record in 13 years of practice. Abbott misappropriated approximately $30,000 of a single client's funds. He was convicted of grand theft in connection with this misappropriation, and the State Bar recommended that we disbar him. Like Kaplan, Abbott did not dispute the substance of the charges but argued instead a significant mitigating circumstance—manic-depressive psychosis. Abbott testified that the illness was under control, and his physicians suggested that under the proper conditions (i.e., supervision and limited access to client funds), Abbott was capable of functioning as an attorney. Nonetheless, we accepted the State Bar's recommendation of disbarment as the appropriate discipline.

We find Kaplan's case in mitigation less persuasive than Abbott's. We accept the State Bar's finding that Kaplan "has not established through clear and convincing evidence, that he no longer suffers from such

emotional difficulties,"[6] and are accordingly unconvinced that the public interest would be well served by rejecting the Review Department's recommendation for some lesser discipline. Without assurance that Kaplan's emotional problems are solved, we must be concerned that routine marital stresses or medical emergencies in the future will trigger similar behavior. (See *In re Naney* (1990) 51 Cal.3d 186, 197 [270 Cal.Rptr. 848, 793 P.2d 54].) While Kaplan's current law partners assure us that he will be given "neither access to, nor control over, any firm or client funds," we find Kaplan's behavior indicative of a level of dishonesty that raises concerns beyond those associated with misappropriation of others' funds. Finally, we find Kaplan's lack of candor with the investigators from the State Bar particularly disturbing.

Kaplan's behavior was grievously improper, and he continued that behavior for several months. While marital stresses and the imminent demise of loved ones are always personal tragedies, we fully expect that members of the bar will be able to cope with them without engaging in dishonest or fraudulent activities, especially on the scale that Kaplan engaged in such activities. In light of both the amount of money and the sustained period over which Kaplan misappropriated Pettit & Martin funds, we are unpersuaded that the State Bar's recommendation was in error.

### III. DISPOSITION

We order that Andrew B. Kaplan be disbarred from the practice of law in the State of California and that his name be stricken from the roll of attorneys. We further order that he comply with rule 955 of the California Rules of Court and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days respectively of the effective date of this order. This order will be effective upon the finality of this decision in this court. (See Cal. Rules of Court, rule 953(a).)

---

[6] In letter briefs dated December 24, 1990, and January 11, 1991, Kaplan directs our attention to evidence that he has been "fully rehabilitated," or "has fully recovered from his prior emotional difficulties." However, in light of the State Bar's finding, we do not consider Kaplan's "rehabilitation" as a mitigating factor. (Std. 1.2(e)(iv); see also *Porter* v. *State Bar*, *supra*, 52 Cal.3d 518.)